STATE of Iowa, Appellee,

v.

Cleo LUTER, Appellant.

No. 83–45.

Supreme Court of Iowa.

March 14, 1984.

Rehearing Denied May 10, 1984.

Jon M. Kinnamon and Jerald W. Kinnamon of Kinnamon, Kinnamon, Russo & Meyer, Cedar Rapids, and Walter D. Braud and Anthony Jamison of Braud, Warner, Neppl & Westencee, Ltd., Rock Island, Ill., for appellant.

Thomas J. Miller, Atty. Gen., Mary Jane Blink, Asst. Atty. Gen., and Denver D. Dillard, County Atty., for appellee.

Considered by UHLENHOPP, P.J., and HARRIS, LARSON, CARTER, and WOLLE, JJ.

UHLENHOPP, Justice.

This appeal involves legal issues which arose in a prosecution on charges of possession of heroin and cocaine with intent to deliver and possession of a firearm by a felon.

On February 23, 1982, three officers concerned with investigating controlled substance violations, one of whom was Agent R.J. Smith, presented sworn informations to a judge for warrants to search, so far as we are now concerned, the residence of defendant Cleo Luter in Cedar Rapids, Iowa, and a Lincoln car used by Luter and registered to his mother. In addition to the residence, Luter owned a tavern and a red and black van.

Each information alleged in substance the following. Affiants are officers assigned to narcotics and drug law enforcement. A confidential informant advised that Luter sold him heroin at Luter's residence. The informant has provided names, addresses, telephone numbers, and types of vehicles of other heroin sellers in the area which the informant obtained by personal contact and association with those persons; affiant Smith verified this data through public records, information from the Cedar Rapids Narcotics Unit, criminal history records, and surveillance of the addresses provided. Intelligence provided by the informant led to the arrest of eight individuals on controlled substance charges. On two occasions affiants supervised the undercover purchase of heroin from Luter at his tavern, the Players Palace. On one of

those occasions the confidential informant was searched and then fitted with a voice transmitter and provided with government funds; the informant met with a known heroin user and asked if he had any heroin to sell; the user responded negatively; the informant and user went to Players Palace to buy heroin from Luter; affiant Smith observed the user enter Players Palace and return shortly to the informant, and heard the user tell the informant, "Cleo sure has good dope. You know he has 2 kinds—the best for the Blacks and the other stuff for the Whites. You know I always got the best."; affiants followed the informant and user away from the area and received the heroin from the user; and during the purchase from Luter by the user, Luter's red and black van was parked in front of Player's Palace. Affiant Smith also supervised the informant while the informant and a known heroin user bought heroin from Luter at his residence within the previous seventy-two hours; in this instance affiant Bruce Kern observed the user drive to the Luter residence, enter the fenced-in yard, go to the rear of the residence, and return shortly; affiant recited facts substantially like those with respect to the described purchase at Players Palace; in addition the user was heard to tell the informant he bought the heroin from Luter; and on this occasion the Lincoln car used by Luter was parked beside the residence. Confidential informants and information from the Cedar Rapids Metro Narcotics Unit indicate that Luter uses the Lincoln and van while trafficking in controlled substances. A confidential informant advised that Luter sold him heroin at Luter's residence. Affiant Smith has established surveillance at Luter's residence, observed Luter enter and leave the building, and also observed known heroin users enter and leave the building, staying only a few minutes. Luter was previously arrested for conspiracy to deliver heroin and the charge was dismissed; he was also arrested for delivery of a controlled substance, with no disposition of the case.

The judge also endorsed on the informations the following sworn statements by Smith: the informant has a prior record, was not under the influence of alcohol or drugs at the time he provided the information, and is an adult; the eight cases mentioned in the information are still pending; no current charges are pending against the informant; and no promises of immunity were made to him.

The judge issued the search warrants.

At no point in the search warrant proceedings or in the subsequent proceedings to suppress were the identities of the informant or the user disclosed by the officers.

Section 808.6 of the Iowa Code prescribes the "knock and announce" rule. *See State v. Farber,* 314 N.W.2d 365 (Iowa 1982). Agent Smith, however, did not proceed in that manner. Armed with the warrants, Smith and other officers established surveillance at Luter's residence on the morning of February 25, 1982. Presently Luter emerged from the house, entered the Lincoln, and drove to a filling station. The officers followed. At the station Smith approached the Lincoln on the passenger side and, through the car window, observed two thirty-five millimeter film canisters in the open ashtray of the car. According to the evidence, "individuals commonly use film canisters to transport controlled substances." Smith then entered the Lincoln on the passenger side and instructed Luter to drive to his residence and unlock it because the officers intended to search it pursuant to a warrant. Luter and Smith proceeded to the residence, as did the other officers.

At the residence the individuals got out of the cars and Lieutenant Schutly stood with Luter while Smith went to get Officer Kidwell, the identification officer, to photograph the canisters in the ashtray. Kidwell had not yet arrived and Smith returned to the Lincoln. The canisters were then missing from the ashtray. At that time Luter was at the house, and Smith proceeded there. The two walked down the steps toward the Lincoln, but Luter started running. Smith followed. Luter removed the canisters from his pocket and

threw them. Smith tackled Luter, placed him under arrest, and handcuffed him. Meantime Detective Stephens looked for the canisters, found them on the ground, and had them logged for identification. Subsequent tests disclosed that one canister contained four heat-sealed plastic bags of cocaine and one such bag of diazepam (a controlled substance), and one finger cot of heroin. The other canister contained four tin-foil packets and four finger cots of heroin. The evidence shows that finger cots are commonly used to store controlled substances.

The officers proceeded to search the house. They discovered and seized:

Five packages of Dormin, each package containing seventy-two Dormin pills. According to the evidence Dormin is commonly used by drug dealers, as distinguished from drug users, as "extenders" —to cut the drug and thus increase the volume for sale.

One empty Dormin bottle in a waste basket and one empty finger cot on a closet floor.

Two scales, one of regular ounce size and one of gram size.

One empty quinine bottle. Quinine is commonly used as an extender and gives a bitter taste which drug users equate with quality.

Straws—commonly used to "snort" cocaine.

Mirrors—commonly used in cutting cocaine on a shiny surface.

Razar blades—commonly used to cut a substance for mixing.

Measuring spoon with powdery residue, approximately gram size commonly used to measure cocaine; and playing card, commonly used to level off measuring spoon.

Glass smoker, commonly used to smoke hashish or marijuana.

Unopened box of a gross of finger cots.

Wrappers of finger cot containers, in garbage.

Baggies with powdery residue inside.

Bits of plastic, commonly used for wrapping controlled substances.

"Pot" pipe.

Pipe of kind used for "freebasing" cocaine.

Sno-Seal of kind sold at head shops.

Glass flasks of kind used to contain controlled substances.

Sifter, containing powdery residue.

Pseudo Caine, commonly used cocaine extender.

Paper squares of kind used to wrap cocaine.

Packet of heroin, found in container in pocket of jacket hanging in bathroom.

Loaded shotgun beside filing cabinet.

Loaded shotgun beside Luter's bed.

In subsequent proceedings the county attorney charged Luter with possession with intent to deliver both heroin and cocaine, and with possession of a firearm as a felon. At trial the State introduced the evidence we have recited from the search incident and evidence that Luter had been previously convicted of a felony. Luter testified he was a user of controlled substances but not a seller. The jury found Luter guilty on all counts, the trial court passed sentence, and Luter appealed.

I. Luter moved before trial to suppress the real evidence, the district court overruled the motion, and Luter unsuccessfully endeavored at trial to exclude that evidence. On appeal he first contends that (1) the search and the seizure were illegal and (2) the search warrants were invalid as based on affidavits (a) lacking proof as to the knowledge and credibility of the unidentified person who provided the information and (b) containing falsification as to the source of that information.

Luter argues that the entire search and seizure were illegal because the judge did not have probable cause to issue a warrant to search the Lincoln. Luter's argument continues that the search of the Lincoln under an invalid warrant led to the seizure of the canisters.

The State argues in opposition that the canisters were not seized under the war-

rant to search the Lincoln; Smith did not stop the Lincoln, Luter himself stopped it at a filling station; Smith had a right to be there; he did not discover the canister from a search of the Lincoln, he saw the canisters from outside the car; nor did he seize the canisters from the car. *See* W. La-Fave, *Search and Seizure* § 2.5, at 355 (1978). The State thus contends that Smith's entry of the car to be returned for search of the house and his subsequent seizure of the canisters when they were found on the ground were not dependent on the warrant to search the Lincoln; Smith had a right to do what he did as a result of events as they transpired at the time, independent of the warrant to search the Lincoln.

We prefer, however, to rest the decision on this point upon another ground. Let Luter's contention be assumed that the seizure of the canisters resulted from the warrant to search the Lincoln. The statements provided the judge in the information were that heroin had been purchased at Luter's Players Palace and at his residence, from which the judge could infer drug operations at both sites. Affiants further swore that the van was "known to be used by Cleo Luter" and was in front of Players Palace when the user bought heroin there; and the Lincoln was likewise "known to be used by Cleo Luter" and was beside Luter's residence when the user bought heroin at that place. The judge could reasonably infer that drugs were probably transported between Luter's two places, the Palace and the residence, and that they were transported in one or both of the vehicles.

■ In determining whether probable cause existed to issue the warrant to search the Lincoln, the judge had a right to consider all the circumstances set forth in the information. *Illinois v. Gates,* —— U.S. ——, ——, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548, *reh'g denied,* —— U.S. ——, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, *given all the circumstances set forth*

*in the affidavit before him,* including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found at a particular place." Emphasis added.); *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637, 645 (1969) (magistrate's determination of probable cause "should be paid great deference by reviewing courts"); *United States v. Ventresca,* 380 U.S. 102, 108, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965) (disapproval of a "grudging or negative attitude by reviewing courts toward warrants" and of interpreting affidavits "in a hyper-technical, rather than a commonsense, manner"). *See also United States v. Evans,* 447 F.2d 129 (8th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 727, 30 L.Ed.2d 735 (1972); *United States v. Mazurkiewicz,* 443 F.2d 1135 (3rd Cir.1971); *United States v. McDonnell,* 315 F.Supp. 152 (D.Neb.1970); *State v. Bennett,* 256 S.C. 234, 182 S.E.2d 291 (1971), *cert. denied,* 405 U.S. 924, 92 S.Ct. 965, 30 L.Ed.2d 795 (1972); *State v. McRae,* 255 S.C. 287, 178 S.E.2d 666 (1971). We reject Luter's contention that probable cause did not exist for the issuance of a warrant to search the Lincoln. By the same token an even stronger showing of probable cause existed for the issuance of a warrant to search the residence.

■ As to Luter's argument that the search warrants were invalid because the affidavits did not contain proof of the two requirements of the credibility and the knowledge of the unidentified informant and user, the United States Supreme Court recently made a substantial change in this area of the law. *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 526 (1983). Previously statements in affidavits as to the factors of reliability and basis of knowledge of persons supplying hearsay information played a controlling role. *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Those factors remain relevant but not absolute; *Gates* changed the test to

the approach of the totality of the circumstances. After considering the underlying considerations, the Court stated in *Gates,* —— U.S. at ——, 103 S.Ct. at 2332, 76 L.Ed.2d at 548 (citations omitted):

> For all these reasons, we conclude that it is wiser to abandon the "two-pronged test" established by our decisions in *Aguilar* and *Spinelli.* In its place we reaffirm the totality of the circumstances analysis that traditionally has informed probable cause determinations. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli.*

■ Applying the *Gates* test and examining the affidavits involved here and all parts of those affidavits including the circumstances and the prior instances recited, we conclude that the issuing judge "had a 'substantial basis for ... conclud[ing]' that probable cause existed."

■ Regarding Luter's argument that the affidavits contained falsification, we turn to *State v. Groff,* 323 N.W.2d 204 (Iowa 1982). We there summarized and adopted the holding in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). We stated:

> In the cited decision the United States Supreme Court held that where a defendant establishes by a preponderance of the evidence an affiant made a false statement in a search warrant affidavit knowingly and intentionally, or with reckless disregard for the truth, the Fourth Amendment requires the statement be deleted from the affidavit and the remaining contents be scrutinized to determine whether probable cause appears. If the remaining contents are insufficient to establish probable cause, the warrant is void and the evidence obtained in the search must be excluded as though probable cause was lacking on the face of the affidavit.

323 N.W.2d at 206.

The gist of Luter's falsification allegation is that the reliability and knowledge of the *user* were important, that the affidavits recited the reliability of the *informant,* and that the affidavits thereby led the issuing judge down the wrong path. *See State v. Paterno,* 309 N.W.2d 420, 424 (Iowa 1981) (false statement is one which leads to a misconception).

We think this approach gives insufficient credit to the issuing judge. The affidavits make plain on their face not once but twice that the two buys in question were not personally consumated by the informant and that a user was also involved. Why the officers found this two-step procedure necessary we need not inquire; the affidavits showed that Luter had been involved in prior drug charges and perhaps he was unusually wary. In any event, on examining the affidavits the issuing judge could hardly have missed the recitation of the two-step procedure. Luter has not demonstrated that the judge misconceived the situation. We hold that the search and seizure were lawful.

■ II. Conceding the evidence was sufficient to convict him of possessing heroin and cocaine, Luter contends that as a matter of law the evidence was insufficient to convict him of intent to deliver those substances. The governing rule is stated in *State v. Robinson,* 288 N.W.2d 337, 340 (Iowa 1980) ("although Iowa courts view the evidence in the light most favorable to the prosecution they must consider *all* the evidence when determining the sufficiency of the evidence to support a guilty ver-

dict"). Substantial evidence must be introduced in support of the charge, and substantial evidence is "such evidence as could convince a rational trier of fact that the defendant is guilty of the crime charged beyond a reasonable doubt." *State v. Aldape,* 307 N.W.2d 32, 39 (Iowa 1981).

Far from being a weak case for the jury, we view this record as a strong jury case of intent to deliver controlled substances as distinguished from mere intent use to them. As the customary instruction states, intent is seldom capable of direct proof and may be ascertained by "such reasonable inferences and deductions as may be drawn from the facts proved by the evidence in accordance with common experience and observation." *State v. Serr,* 322 N.W.2d 96, 101 (Iowa App.1982). Relevant considerations include manner of packaging the substance; presence of weighing devices; and existence of other paraphernalia commonly used in drug dealing. *State v. TeBockhorst,* 305 N.W.2d 705, 708 (Iowa 1981); *State v. Birkestrand,* 239 N.W.2d 353, 362 (Iowa 1976); *State v. Boyd,* 224 N.W.2d 609, 612–13 (Iowa 1974).

■ The evidence of the canisters found outside the residence and the evidence found inside the residence is replete with the instrumentalities of the drug trade. Luter was transporting the canisters from his residence to some destination at the time he was intercepted. Recovered after he attempted to dispose of them, one canister contained four heat-sealed bags of cocaine and one of diazepam and a finger cot of heroin, and the other canister contained four tinfoil packets and four finger cots of heroin.

Luter argues that the actual amounts of cocaine and heroin in the packets were small; thus he concludes an inference of intended personal use is as reasonable as an inference of intended delivery to others. But the number of packets, taken with the items found in the residence, persuade us that a jury could reasonably infer intent to deliver.

Not only could the jury find that the items seized constituted persuasive evidence of what Luter was up to, it could also find that the State's cross-examination of Luter's explanation of the items was devastating—for example, Luter's attempt on cross-examination to explain away 360 Dormin pills or a gross of finger cots. We hold that abundant evidence was introduced from which the jury could reasonably find intent to deliver.

■ III. Luter's next proposition relates to his conviction of possession of a firearm as a felon. The General Assembly has provided in section 724.26 of the Iowa Code (1981):

Any person who is convicted of a felony in any state or federal court and who subsequently possesses, receives, or transports or causes to be transported a firearm or offensive weapon is guilty of an aggravated misdemeanor.

Also in section 724.27:

The provisions of [section] ... 724.26 shall not apply to a person who is pardoned or has had his or her civil rights restored by the President of the United States or the chief executive of a state and who is expressly authorized by the President of the United States or such chief executive to receive, transport, or possess firearms or destructive devices.

Luter argues that the State had the burden to negate the existence of the exceptions under section 724.27. Neither party introduced any evidence on that subject.

This proposition is controlled, adversely to Luter, by the analogy of our recent holding in *State v. Bowdry,* 337 N.W.2d 216 (Iowa 1983). We do not find merit in Luter's proposition.

■ IV. Luter demanded to know the identity of the user who allegedly bought heroin from him. The trial court sustained the State's objections that the user's identity was privileged. Luter argues that the court erred. The problem arises in two contexts: disclosure *at trial* of the user's identity, and disclosure at the *pretrial*

*hearing* on the motion to suppress the evidence obtained under the search warrants.

A. If an informant does not simply provide officers with information but personally observes or participates in the incident which is the basis of the charge on which the defendant is tried, fairness dictates that the defendant ordinarily be apprised of the identity of the informant so that he can ascertain what the informant knows about the incident and perhaps use the informant as his own witness. In this context the individual in question is not merely an *informant*, he is a *witness* to the event. *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639, (1957); *State v. Webb*, 309 N.W.2d 404 (Iowa 1981); *State v. York*, 256 N.W.2d 922 (Iowa 1977); *State v. Sheffey*, 243 N.W.2d 555 (Iowa 1976); *State v. Lamar*, 210 N.W.2d 600 (Iowa 1973).

■ On the other hand, the cited decisions also state as a general rule that the prosecution cannot ordinarily be required to divulge the identity of an informant as such, as distinguished from a witness to the event constituting the basis for the charge. The reasons for this privilege of nondisclosure are articulated in 8 Wigmore, *Evidence* § 2374, at 761–62 (McNaughton rev. 1961):

> A genuine privilege, on ... fundamental principle ... must be recognized for the identity of persons supplying the government with information concerning the commission of crimes. Communications of this kind ought to receive encouragement. They are discouraged if the informer's identity is disclosed. Whether an informer is motivated by good citizenship, promise of leniency or prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity—to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him. The government also has an interest in nondisclosure of the identity of its informers. Law enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities. Revelation of the dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship.

> That the government has this privilege is well established, and its soundness cannot be questioned.

In the present case the user did not participate in the seizure of the two canisters or of the paraphernalia in the residence. The charge which was tried was not predicated on an incident that the user observed or in which he participated. We thus think the trial court was right in refusing to require the State to divulge the user's identity *at trial*. Luter could and did obtain a fair trial without that knowledge.

■ B. Disclosure of the user's identity in the *pretrial hearing* on the motion to suppress presents a closer question. Here we have two opposing considerations. On the one hand, the user did participate in the purchases of heroin which constituted incidents recited in the informations for search warrants. On the other hand, those purchases of heroin were not the basis for the charge; they were part of the intelligence previously used to obtain warrants. This distinction is significant. *State v. Burnett*, 42 N.J. 377, 386–87, 201 A.2d 39, 44 (1964) ("We must remember also that we are not dealing with the trial of the criminal charge itself. There the need for a truthful verdict outweighs society's need for the informer privilege. Here, however, the accused seeks to avoid the truth. The very purpose of a motion to suppress is to escape the inculpatory thrust of evidence in hand, not because its probative force is diluted in the least by the mode of seizure, but rather as a sanction to compel enforcement officers to respect the constitutional security of all of us under the Fourth Amendment."). As the purchases by the

user are not the basis for the charges on trial, if the user himself had been in confederation with the officers in making the purchases for the purpose of obtaining a warrant we would not hesitate to apply the informant privilege to him and uphold the district court's ruling of nondisclosure.

Luter argues that the user was not in confederation with the officers and thus was not really an informant; he bought the heroin for the informant, not for the officers. Hence, so Luter's argument goes, the basis for the privilege of nondisclosure—to promote the free flow of information—does not exist.

Under the particular circumstances of this case, however, we think for two reasons the user should be treated, for nondisclosure purposes, the same as an informant. First, in fact the user was a part of Agent Smith's apparatus for obtaining a buy and was actually an extension of the informant himself; and second, revelation of the user's identity, if known, would seriously jeopardize the informant's anonymity contrary to the rationale of the informant privilege. In addition, the principal argument in opposition to the informant privilege is the possibility of police perjury— perhaps an informant may not even exist. 1 LaFave, *Search and Seizure* § 3.3(g) (1978). Even if we were inclined to accept the perjury argument, which we are not, we would doubt that the present more complicated two-step arrangement for the purchases would be a figment of the officers' minds, as distinguished from an actual happening. Why would they invent such an involved event for their informations? We hold that the trial court did not err in refusing to require disclosure of the user's identity.

■ V. In two divisions of his argument Luter alleges error in the trial court's failure to give his requested instruction that if an inference of guilt of possession of heroin is as consistent with the evidence as an inference of possession of heroin with intent to deliver, the jury must find Luter not guilty of possession of heroin with intent to deliver, and that the jury must not speculate on whether the greater or the included offense was committed. The request also covered the cocaine charge. Luter claims he was entitled to a directed verdict for the same reason. He relies on a case involving a federal trial, *United States v. Jones,* 418 F.2d 818 (8th Cir.1969).

*Jones* involved a prosecution for robbery and for receiving stolen property, predicated on possession by the defendant of the stolen property. We need not say whether we would follow that decision in a corresponding evidentiary context. The evidence here goes considerably beyond mere possession of the heroin and cocaine. It involves a substantial amount of damning real evidence in the form of the accoutrements of the drug trade.

Moreover, the trial court submitted the criminal case in the way which is customary in this jurisdiction. It initially told the jury that guilt must be established by the State beyond a reasonable doubt. Proceeding to the charge of heroin (and correspondingly, to the charge of cocaine), the court told the jury that it could not find Luter guilty of possession with intent to deliver unless the State established beyond a reasonable doubt all of the elements, namely, (1) possession of heroin, (2) knowledge that the substance possessed was heroin, and (3) intent to deliver the substance; that if the State so established all of the three elements the jury will find guilt of possession of the controlled substance with intent to deliver; that if the State so established elements 1 and 2 but not 3, the jury will find guilt of possession; and if the State failed to establish element 1 or 2, the jury will find defendant not guilty. The instruction conformed to II *Iowa Uniform Jury Instructions* No. 3004A (1982). It sufficiently and properly stated the Iowa law on the point Luter now raises. A trial court may use its own form of instructions when they properly state the law on the

issues. *State v. Rupp*, 282 N.W.2d 125, 126 (Iowa 1974).

■ By the same token no necessity existed for the trial court to instruct under *Jones* that the jury could not speculate as to whether the greater or lesser offense was committed—possession with intent to deliver, or mere possession. The court negated any jury finding based on speculation when it confined the jury findings to proof beyond a reasonable doubt of all elements of the respective charges. We find no error.

■ VI. In the next two divisions of his argument Luter objects to the trial court's inclusion of the last paragraph of uniform criminal jury instructions 215 (intent) and 230 (knowledge), which accord with the bar association committee's notation to the uniform instruction on possession of a controlled substance with intent to deliver, No. 3004A ("With this offense, Uniform Instruction 215—Intent, and Uniform Instruction 230—Knowledge, should be given."). After stating that intent (or knowledge) is seldom capable of direct proof and may be ascertained by reasonable inferences from the facts proved in accordance with common experience and observation, the last paragraph of uniform instruction 215 (and 230) states:

> In determining the intent [knowledge] of any person, you may, but are not required to infer that he intended [knew] the natural and probable consequences which ordinarily follow such acts.

Luter argues that this paragraph tends to nullify the presumption of innocence and to shift the burden of persuasion to him.

We considered this subject fully in *State v. Rinehart*, 283 N.W.2d 319 (Iowa 1979), *cert. denied*, 444 U.S. 1088, 100 S.Ct. 1049, 62 L.Ed.2d 775 (1980). *See also Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The trial court also gave instructions on the presumption of innocence and on the State's burden of proof. The paragraph in question is a proper statement of law. *State v. Elam*, 328 N.W.2d 314 (Iowa 1982).

■ Luter also argues no "acts" by him are involved in the case, and the paragraph is inappropriate for that additional reason. But his possession of the drug dealer paraphernalia involved conduct by him—he acquired them at some point and maintained them in his residence—and therefore involved a species of acts. His conduct with reference to the two canisters also involved acts. We do not find merit in these two divisions of his argument.

■ VII. Luter argues that the trial court should have granted his motion for mistrial based on misconduct of the prosecutor in cross examining him.

The State's case on possession itself was overwhelming. The effort of the defense was to avoid a conviction for possession "with intent to deliver." To that end Luter took the stand and endeavored to convince the jury he was merely a drug user and thus to negate the State's claim he was a drug dealer. Accordingly Luter testified at length on direct examination about his use of cocaine and heroin, manifestly to leave the impression that this was the extent of his involvement with drugs.

The drug dealer paraphernalia which the State seized militated in the opposite direction—that Luter was in the drug business. Seeking to refute the impression that Luter tried to create in his direct examination, the prosecutor interrogated Luter directly about selling drugs. Trial counsel for Luter allowed several of these questions to be asked and answered before he interposed a motion for mistrial. The trial court treated the motion as an objection to the pending question and sustained it, and the matter was not pursued.

We pass by the point that if defense counsel regarded this cross-examination as improper he should have interposed his objection at the outset of it, and the additional point that the prosecutor did not succeed in getting admissions from Luter—the answers were negative. *See* 24B C.J.S.

*Criminal Law* § 1914(5), p. 29 (1962) (no prejudice). We incline to the view that the defense tactics in the direct examination opened the door to this cross-examination. The defense wanted to show and argue that Luter was a mere user—without any cross-examination on that subject. But when Luter opened the subject of his role with respect to drugs, he could not escape cross-examination which directly bored into it.

Cross-examination of the accused in a criminal case is strictly confined to the matters testified to on direct examination. Iowa R.Crim.P. 19(1). "This does not mean, however, that the 'prosecutor can only parrot the questions propounded on direct. Cross-examination may deal with *matters* inquired into on direct, and questions fairly within the area of those matters constitute proper cross-examination.'" *State v. Holmes*, 325 N.W.2d 114, 117 (Iowa 1982) (quoting *State v. Jensen*, 189 N.W.2d 919, 923–24 (Iowa 1971)). *See also State v. Freie*, 335 N.W.2d 169 (Iowa 1983); *State v. Jackson*, 259 N.W.2d 796 (Iowa 1977). We find no error here.

■ VIII. Luter contends the trial court erred in admitting items of real evidence into the record over his objection that a chain of custody was not established. We stated in *State v. Lamp*, 322 N.W.2d 48, 57 (Iowa 1982) (citations omitted):

> As a foundational prerequisite to the admissibility of physical evidence, the prosecution is required to show a sufficient custody to establish that the article has not been altered between the time it was obtained and the time it is introduced at trial. The showing required is that it is reasonably probable that tampering, substitution, or alteration did not occur. The sufficiency of the showing is dependent on the susceptibility of the article to alteration or substitution. Whether the prosecution has established a proper chain of custody is a matter committed to the sound discretion of the trial court; reversal is warranted only

when there has been a clear abuse of discretion.

We have examined the record with respect to these items of evidence and hold that an abuse of discretion by the trial court does not appear.

■ IX. Luter asserts finally that the trial court erroneously allowed testimony to be introduced on direct and redirect examination of Agent Smith regarding surveillance of Luter. He argues that the testimony was hearsay, immaterial, beyond the scope of the cross-examination, and outside the minutes of testimony. The testimony in question manifestly was not hearsay or immaterial. It was background information within the knowledge of Smith, and it was pertinent to the charges on trial. If the testimony on redirect examination was beyond the scope of cross-examination of Smith—which we question—it still would not warrant a reversal of the judgment. Luter could have recross-examined the same as if the State had recalled Smith for further direct examination, and indeed the court offered to let Luter do so. The question is thus whether error occurred because the testimony went beyond the minutes.

We stated the present rule on this point as follows in *State v. Walker*, 281 N.W.2d 612, 614 (Iowa 1979):

> Minutes need not detail each circumstance of the testimony, but they must be sufficient—fully and fairly—to alert defendant generally to the source and nature of the evidence against him. The testimony Kehoe gave on recall concerned a matter—business records—which the state concedes it did not know about until the trial was underway. The minute did little more than identify the witness and state the conclusion that the tires in question were stolen. Under the new rules defendant is entitled to more.

We have also held that error in admitting testimony which does go beyond the minutes can be harmless, if the defendant was apprised of it before trial so that he was

aware of it. After citing the *Walker* rule, we stated in *State v. Waterbury*, 307 N.W.2d 45, 51 (Iowa 1981) (citations omitted):

> But in this case defendants were thoroughly apprised of the evidence to be presented by this witness's testimony two months before trial. The elements of surprise or prejudice were non-existent. Thus we hold there was no reversible error in permitting the testimony to be introduced despite the faulty minute in the trial information. Our ruling should not be interpreted as imposing any burden on an accused to take discovery depositions to avoid a claim of waiver of error relating to an incorrect or insufficient minute of testimony.

We reaffirmed *Waterbury* in the more recent case of *State v. Conner*, 314 N.W.2d 427 (Iowa 1982).

We are satisfied that from Luter's discovery and the hearings on motions to suppress, Luter was aware of the substance of this testimony and was not surprised by it at trial. No prejudice appears. We also note that this testimony was preliminary and foundational in nature and not of sufficient cogency on the merits to constitute a basis for reversal of the judgment.

On the whole case we are impressed by the record that Luter was thoroughly and vigorously defended and received a fair trial. The verdict and sentence should stand.

AFFIRMED.