**STATE of Iowa, Appellee,**

v.

**Toby Lee SWAIM, Appellant.**

No. 86–419.

Supreme Court of Iowa.

Sept. 23, 1987.

Charles L. Harrington, Appellate Defender, and John P. Messina, Asst. Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Christie J. Scase, Asst. Atty. Gen., Denver D. Dillard, Co. Atty., and Mona Knoll, Asst. Co. Atty., for appellee.

Considered by REYNOLDSON, C.J., and HARRIS, LARSON, LAVORATO and NEUMAN, JJ.

NEUMAN, Justice.

Defendant Toby Lee Swaim, convicted of the crime of second-degree burglary in violation of Iowa Code sections 713.1 and 713.5 (1985) and sentenced as an habitual offender in accordance with Iowa Code section 902.8, advances two grounds for reversal of his conviction: (1) that the trial court erroneously overruled pretrial motions to suppress evidence seized in warranted searches of a garage, residence and safety deposit box; and (2) that defendant's jail house confession was obtained without a valid waiver of his right to counsel. We affirm on the first ground, reverse on the second and remand for new trial.

### I. Background Facts and Proceedings.

On October 9, 1985, a burglary occurred at a Cedar Rapids sporting goods store known as "Sports Outfitters." A large number of handguns, other weapons and ammunition were taken in the burglary. A police investigation identified defendant as a possible suspect. In late November 1985, police secured three separate warrants to search a garage, residence and safe deposit box used by the defendant. The warrants were based on tips from confidential informants and police surveillance. Each of the searches conducted pursuant to these warrants yielded evidence linking defendant to the Sports Outfitters' burglary. During the residential search defendant was arrested and taken into custody. After several days in custody, defendant confessed to the crime.

Defendant filed timely pretrial motions to suppress the evidence seized as a result of the searches, claiming (1) that the warrants were issued without a proper determination of probable cause as required by Iowa Code section 808.3 (Supp.1985) and the fourth and fourteenth amendments to the United States Constitution; (2) that two of the warrants were based upon the fruits of prior illegal searches; and (3) that certain items seized were not specified in the warrants. Defendant also moved to suppress a confession he gave to investigating officers as having been obtained in violation of his sixth and fourteenth amendment right to the assistance of counsel.

Further facts will be detailed as they become pertinent to defendant's suppression claims, renewed on this appeal.

### II. Search Warrants.

Defendant challenges the constitutionality of the procedure used by the State to obtain the search warrants. Our review, therefore, is de novo. *State v. Bousman,* 387 N.W.2d 605, 609 (Iowa 1986). Our task is to consider the totality of the circumstances surrounding issuance of the challenged warrants. *State v. Leto,* 305 N.W.2d 482, 484 (Iowa 1981). We are guided in this examination by fundamental principles, chronicled here from our opinion in *State v. Seiler,* 342 N.W.2d 264 (Iowa 1983):

It is axiomatic that search warrants are to issue only upon a finding of "probable cause." "Probable cause" for the issuance of a warrant exists only "when

the facts and circumstances presented to the judicial officer are sufficient in themselves to justify the belief of a reasonably cautious person that an offense has been ... committed." *State v. Leto*, 305 N.W.2d 482, 485 (Iowa 1981); *State v. Boer*, 224 N.W.2d 217, 219 (Iowa 1974), or "that ... evidence is presently being ... concealed at the place to be searched." *State v. Post*, 286 N.W.2d 195, 199 (Iowa 1979). Nonetheless, "there is a large difference between" proof of guilt and proof of probable cause, *Brinegar v. United States*, 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879, 1889 (1949). Although it may be difficult to discern in a particular case whether an affidavit demonstrates the existence of probable cause "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965); *Leto*, 305 N.W.2d at 485.

*Id.* at 266.

Notwithstanding the substantial deference to be given judicial determination of probable cause, it is the responsibility of a reviewing court to insist that the issuing magistrate's function be performed in a neutral and detached manner, not serving merely as a rubber stamp for the police. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723, 727 (1964); *accord Spinelli v. United States*, 393 U.S. 410, 415, 89 S.Ct. 584, 589, 21 L.Ed.2d 637, 643 (1969); *Illinois v. Gates*, 462 U.S. 213, 240, 103 S.Ct. 2317, 2333, 76 L.Ed.2d 527, 549, *reh'g denied*, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983). In *Illinois v. Gates*, however, the Supreme Court abandoned the rigorous application of the two pronged *Aguilar-Spinelli* test for assessing an informant's credibility and basis of knowledge, and in its place substituted a "totality of the circumstances" test in which:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332, 76 L.Ed.2d at 548 (citation omitted).

■ We adopted and applied this *Gates* standard in *State v. Bousman*, 387 N.W.2d at 610 and *State v. Luter*, 346 N.W.2d 802, 808 (Iowa 1984). In *Bousman*, however, we briefly noted the 1985 amendment to Iowa Code section 808.3, not applicable to that case but fully applicable to the case before us. *Bousman*, 387 N.W.2d at 611. The statute as amended provides that if the grounds for issuance of a search warrant are supplied by an informant,

> the magistrate shall identify only the peace officer to whom the information was given but shall include a determination that the information appears credible either because sworn testimony indicates that the informant has given reliable information on previous occasions or because the informant or the information provided by the informant appears credible for reasons specified by the magistrate.

Iowa Code § 808.3 (Supp.1985). It is upon this statute that defendant rests his case, arguing that the legislation, enacted in response to *Gates* and *Luter*, requires more than a totality of the circumstances approach to the determination of probable cause.[1] The State seems to agree, assert-

---

1. Based on defendant's reply brief, we perceive that he has demurred to the State's argument that *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, *reh'g denied*, 468 U.S. 1250, 105 S.Ct. 52, 82 L.Ed.2d 942 (1984) (good faith exception to exclusionary rule) prevents a successful challenge to the warrants on federal constitutional grounds. It is well settled that state law furnishes a supplemental source of rights where a state constitution or statutory law affords greater protection of individual rights than the federal constitution. *See State v.*

ing that the statute as amended serves a two-fold function: (1) it alerts magistrates to the proper factors to be given consideration under the *Gates* totality of the circumstances test; and (2) it requires that the magistrate expressly include in the warrant endorsement a statement of his or her reasons for finding the informant or the informant's information credible, thereby simplifying this court's review process. Concurring in this analysis, we turn to an examination of the affidavits offered in support of the warrants at issue.

Preliminarily we note that the case involved searches under three separate warrants. The first involved the search of a garage at 4830 First Ave., N.E. in Cedar Rapids which uncovered a number of guns stolen from Sports Outfitters. The second involved the search of a residence at 117 33rd St. Dr., S.E. in Cedar Rapids, which yielded keys matching the garage padlock and a key to a safe deposit box at a local bank. The third warrant, authorizing the search of the safe deposit box, produced more property taken in the Sports Outfitters' burglary. We consider the warrants in turn.

### A. Garage.

■ Cedar Rapids Detective Richard Hamblin drafted the affidavit upon which the police sought to search the garage. Because the affidavit furnishes the basis for all three warrants, each challenged by the defendant as insufficient under Iowa Code section 808.3, we set it out below in its entirety, typed as in the original:

> In June of 1985, I received information from a confidential informant (A) that a Toby Swaim had been involved in a burglary of a hardware store near Mechanicsville, Iowa, and that he had taken about 80 guns, in fact, the confidential informant saw one of the guns. After Toby took the guns, which the informant told me would have occurred sometime near the first of May, he rented a garage under a false name in the garage complex just East of Shakey's Pizza located at 4810 1st Ave NE and the guns were stored in the garage.

> The confidential informant told me that Toby's partner was another ex-con that lived in the first house behind Pool Tech at 1st Ave and 33rd St Dr SE. I was also told that Swaim and the unknown ex-con had done other burglaries and that they had been using a green van that belonged to the guy living on 33rd St Dr SE. The van could be identified by a large dent in one of the rear doors. I was told further that the person who owned the van had his wife or girlfriend drive for him and Toby while they went out and did their burglaries. I had already been doing surveillance on both Toby Swaim and the residence at 117 33rd St Dr SE. The person in question was a Robert Hutchison and was on parole for habitual offender because of burglaries.

> I observed the green van with the dent in the rear door and checked with the parole office and found that Hutchison gave his address as 117 33rd St Dr SE, and that he lived in that residence with a Mary Glade. While doing surveillance, I observed a small blue car in front of the residence; this being registered to a Mary Glade with that address. Lt. Fiser of the Linn County Sheriffs Office and I have been doing surveillance on Hutchison for some time and both of us observed Toby Swaim at the Hutchison's residence at various times and dates during the Summer of 1985.

> Later I found out that Toby Swaim had rented a garage behind Shakey's, but only during the month of May 1985. He started renting the garage just days before the burglary at Mechanicsville and rented the garage for approximately thirty days. I then checked and found that a large theft had occurred at the Cook Hardware Store in Mechanicsville and that approximately 80 guns had been taken.

*Russell,* 147 N.W.2d 22, 25 (Iowa 1967); *New Jersey v. Hunt,* 91 N.J. 338, 344–46, 450 A.2d 952, 955 (N.J.1982); Comment, *The Interpretation of State Constitutional Rights,* 95 Harv.L.Rev. 1324, 1367 (1982).

Then on October 9, 1985, I started an investigation of a burglary at Sports Outfitters, Incorporated, 5717 16th Ave SW. During this investigation, I have been working with FBI agent, Richard Heft, Lt. Fiser, Linn County Sheriffs Department, and Detective Greco, Cedar Rapids Police Department. We believe that shortly after midnight on October 8 or early October 9, the burglars entered the business through the back door and took a large number of firearms and ammunition. The burglars had cut the alarm wire, which set off the burglar alarm. Officers from the Cedar Rapids Police Department responded to the alarm; however, did not notice the cut phone lines and thought the business to be secure. It was then left without anyone resetting or repairing the alarm system. The burglars probably went back in right after Cedar Rapids police cars left. Right after, the Cedar Rapids dispatcher sent a police unit to the alarm.

Linn County Deputy Sheeley was going West on Highway 30 and observed a small white pickup with a white topper pull out of Sports Outfitters. This matched the description of Toby Swaim's 1979 white Dodge truck.

Lt. Fiser and myself started surveillance on Hutchison and Swaim's residences and for approximately a week and a half after the Sports Outfitters burglary, we saw Swaim at Hutchison's house every day.

On October 30, 1985, Robert Hutchison was arrested in Omaha, Nebraska with twenty of the stolen guns. He was driving his green van when arrested.

We continued on surveillance and continued to see Toby Swaim or his truck parked at Hutchison's residence on numerous occasions.

During the first part of November, I talked to a confidential informant (B) who told me that Toby Swaim had a bunch of stolen guns and was trying to sell them very cheap. This informant is a businessman in the community and was afraid that Toby would kill him or his family if he testified against him.

I also talked to another confidential informant (C), who told me that Hutchison and Mary Glade had lived together for some time and that she would definitely cover or protect Hutchison in any way. This informant also had knowledge of one handgun being in the residence just prior to October 30, 1985.

I also received information from a confidential, reliable informant (D) that a large number of guns from the burglary are currently being stored in a garage that Mary Glade has control of.

On November 21, 1985, Lt. Fiser saw Toby and a female, thought possibly to be Mary Glade, leave the residence at 117 33rd St Dr SE approximately 9:30 p.m. in Toby's white truck. Lt. Fiser followed Toby and the female to 4830 1st Ave NE where Toby entered a garage number 29. He was in the garage for about ten minutes and then the two of them left again in the truck.

On November 22, 1985, Detective Greco and myself checked with the manager of the rented garage and found that garage number 29 at 4830 First Ave NE was currently being rented by Mary Brown of 117 33rd St Dr SE. This garage had been rented by her on October 10, 1985, which is one day after the gun burglary.

During our entire investigation, we have not run across any information that would lead us to believe that the guns have been dispersed; other than the 20 that were recovered in Nebraska.

Attached to the affidavit were separate checklists for each informant on which Detective Hamblin checked optional reasons supporting each informant's reliability. With regard to Informant D (the only informant whose credibility is challenged) the detective checked two characteristics: "mature individual" and "no motivation to falsify the information." The judge's endorsement indicated reliance on no sworn testimony "other than affidavits" and that Informant D's information appeared credibile "for the reasons indicated in Attachment B." (Credibility checklist).

Defendant argues that the affidavit fails to establish the credibility of Informant D as required by section 808.3 and therefore the sufficiency of the judge's probable cause determination must be measured without reference to the information allegedly furnished by this informant. Without that information, defendant claims, the affidavit fails to establish probable cause.

While we agree that excision would be the proper remedy if unlawful information were relied upon, *see State v. Seager,* 341 N.W.2d 420, 425 (1983), we disagree with defendant's contention that the affidavit does not satisfy the requirements of section 808.3 or that the affidavit as a whole furnished insufficient facts from which a "reasonably cautious person" would be justified in the belief "that an offense has been or is being committed." *State v. Leto,* 305 N.W.2d at 485; *see generally* Iowa Code §§ 808.2, .3.

Turning first to defendant's statutory argument, we note the State's concession that if no further information had been made available to the issuing judge concerning Informant D, her finding that "D" was a credible informant would have been questionable. Moreover, there is a certain appeal in defendant's assertion that cases like this one highlight the weakness of a checklist endorsement. A statutory scheme which requires "reasons specified by the magistrate" seems logically to call for more input from the decision maker than marking an "x" on a laundry list of informant characteristics. Mindful as we are that these documents are "normally drafted by nonlawyers in the midst and haste of a criminal investigation," *State v. Paschal,* 300 N.W.2d 115, 118 (Iowa 1981) (quoting *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965)), we are nevertheless compelled to carefully balance that consideration against the court's duty to conscientiously review the sufficiency of the affidavits to ensure that the issuing magistrate's action is not a mere ratification of the bare conclusions of others. *Illinois v. Gates,* 462 U.S. at 239, 103 S.Ct. at 2333, 76 L.Ed.2d at 549. We believe the legislature enacted the requirements of section 808.3 to aid the court in that balancing process.

■ Though the question is not free from doubt, we conclude that the magistrate's reference to the affidavit and its attachments as furnishing the specific reasons supporting her finding of Informant D's credibility substantially complies with the statute's requirements. As noted, the affidavit indicated that independent police investigation confirmed the defendant's access to a rented garage leased to a "Mary Brown" who listed her address at 117 33rd St., Dr. S.E. This was the address at which Mary Glade, the defendant's partner's girlfriend resided, and a place frequented by defendant. The affidavit further revealed that this garage had been leased by Brown on the day after the Sports Outfitters burglary. Furthermore, storing stolen guns in a rented garage was a pattern of behavior consistent with the defendant's prior actions, as described by Informant A, a citizen informant whose credibility was well established by the affidavit and attachments and confirmed by police investigation.

■ Independent corroboration of the details of an informant's tip, even if limited to observation of innocent behavior, may serve as strong support for that informant's reliability. *See Illinois v. Gates,* 462 U.S. at 243–44 n. 13, 103 S.Ct. at 522 n. 13, 76 L.Ed.2d at 532 n. 13; *United States v. Arenal,* 768 F.2d 263, 267 (8th Cir.1985); *United States v. Udey,* 748 F.2d 1231, 1239–40 (8th Cir.1984) *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985). We therefore reject defendant's suggestion that the warrant should be invalidated for failure to comply with the statute.

Based on the factual scenario previously outlined, we similarly find no merit in defendant's contention that with or without Informant D's testimony, a reasonably cautious person would not believe that guns from the Sports Outfitters' burglary would be found in the garage on First Avenue. We therefore affirm the trial court's denial of defendant's motion to suppress on this ground.

**B. Residence.**

The warrant for search of the residence on 33rd St. authorized, among other things, the seizure of "keys fitting padlocks to garage 29, located at 4830 31st Ave. N.E." The affidavit furnished in support of this warrant was identical to the affidavit for the garage warrant, with the addition of three paragraphs at the end noting the fruits of the search of the garage. Among the fruits of search were two padlocks. Police believed the keys to those padlocks would be found at the 33rd St. address where Mary Glade was known to reside and defendant was observed regularly "during the late night hours."

When the warrant to search the 33rd St. residence was executed, the police seized two separate sets of keys from a living room table. The previously seized padlocks were tested at the scene and it was determined that two of these keys fit the padlocks. The police thereafter took custody of not only the keys fitting the padlocks, but all the remaining keys as well.

Based on defendant's assertion that the initial search of the garage was unlawful, he claims that the warrant to search for the keys was likewise unlawful as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963). Because we have concluded that the garage search was lawful, we summarily reject defendant's contention that the fruits of that search must be suppressed.

**C. Safe Deposit Box Keys.**

Defendant further argues that even if the warrant to search the 33rd St. residence were valid, the seizure of defendant's safe deposit box keys during the execution of the warrant was plainly unlawful because the warrant authorized seizure only of "keys fitting padlocks to garage 29." Moreover, claims defendant, this unlawful seizure invalidated the officer's subsequent procurement of a warrant to search the safe deposit box. Thus the evidence uncovered by that search should similarly be suppressed under the *Wong Sun* rationale.

While the general rule is that a search must be confined to the terms and limitations of the warrant authorizing it, it is widely recognized that officers executing a valid search warrant may seize additional incriminating evidence found during execution of the warrant. *See Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564, 582–83, *reh'g denied,* 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971); *United States v. Eschweiler,* 745 F.2d 435, 439–40 (7th Cir.), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1188, 84 L.Ed.2d 334 (1984); *United States v. Freeman,* 685 F.2d 942, 957–58 (5th Cir.), *reh'g. denied,* 689 F.2d 190 (1982); *State v. Oliver,* 341 N.W.2d 744, 745–47 (Iowa 1983). Where, as here, a search warrant issued in connection with a burglary investigation authorizes seizure of specifically identified keys, other courts have held that officers executing that warrant may validly seize a safe deposit box key which they reasonably believe may lead to the discovery of stolen property. *United States v. Eschweiler,* 745 F.2d at 439–40; *see also United States v. Freeman,* 685 F.2d at 957–58.

At the suppression hearing, the officers testified to their reasonable belief that the safety deposit key would lead them to the discovery of more stolen property. Under the circumstances, we conclude that the officer's suspicion was justified and seizure of the keys was legal. *Cf., United States v. Eschweiler,* 745 F.2d at 439–40. Because the application for a warrant authorizing search of the defendant's safe deposit box was supported by probable cause established through valid police investigation, we affirm the district court's denial of the motion to suppress.

**II. *Confession.***

During the search of the 33rd St. residence, defendant was arrested and placed in custody at the Linn County jail. Following his initial appearance, counsel was appointed to represent him. *See* Iowa R.Crim.P. 2(3), 26. While incarcerated, he telephoned the Cedar Rapids Police Department and informed a Detective Washburn that he was "interested in getting a set of keys back" that had been taken at the time

of his arrest. Being unfamiliar with the case, Detective Washburn told defendant he would try to contact Lt. Hamblin and if he did not hear from him, defendant should call back the next day. Defendant placed another call sometime later. This time he spoke with Assistant Police Chief Barnes who told defendant he would leave a message for Detective Hamblin. Hamblin testified that the message he received stated defendant "had questions about his property or some keys, and he wanted me to call him."

Rather than respond by telephone to defendant's inquiry, Lt. Hamblin contacted Detective Greco and the two of them, armed with a *Miranda* waiver form, paid a visit on defendant at the jail. After introducing themselves and announcing that they had come over "because of the Sports Outfitters' burglary" they engaged defendant in a conversation described as follows by Lt. Hamblin:

Q. And what if anything did Toby Swaim say to you on your first seeing him? A. He started talking to me about some property and some keys he wanted to know where they were at.

Q. Did you answer him? A. To a point. I asked him to sit down and read the waiver of rights.

Q. What was the reason in asking him to read the waiver of rights? A. Because I didn't know what he wanted to talk—what he wanted to talk to me about, and I already told him we came over because of the Sports Outfitters burglary and I thought he might want to talk about Sports Outfitters burglary but I wanted him to be aware of his rights before he did so.

Q. Did you advise him of his rights? A. I did. He read through the waiver and eventually he said he undertood. He kept—He would read for a short ways and then start talking again. I wanted him to read the whole thing and understand it first.

Q. What was he talking about in reading his part of the waiver of rights? A. About some of the keys, that he wanted some of his keys back.

Q. Did he tell you what the keys were for? A. Not at that time.

After reading and signing the waiver of rights form presented by the officers, defendant made several statements implicating himself in the burglary. At the suppression hearing, Hamblin readily acknowledged that he did not go to talk to defendant just about the keys though he admitted that the phone message gave no indication that defendant wished to talk about the Sports Outfitters' burglary.

Based on this factual record, defendant argued before the trial court that his sixth amendment right to assistance of counsel had been violated and any uncounseled statements he made under such circumstances must be suppressed. The trial court denied the motion, concluding that defendant's jail house confession was knowing, voluntary, and not procured through any exploitation by the State, but at defendant's invitation. Our de novo review of those same facts, viewed in the light of *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) leads us to reach a contrary conclusion.

In *Michigan v. Jackson,* the United States Supreme Court reiterated the bright line rule of *Edwards v. Arizona* which held that

> when an accused has invoked his [fifth amendment] right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.

*Michigan v. Jackson,* 475 U.S. at ——, —— n. 9, 106 S.Ct. at 1410 n. 9, 1411, 89 L.Ed.2d at 641 n. 9, 642 (citing *Edwards,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386, *reh'g denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981)). Finding the necessity for such a safeguard "even stronger after [defendant] has been formally charged with an offense than before," the court in *Michigan v. Jackson* found the prophylactic measure applicable to sixth amendment as well as fifth amendment violation claims, holding that "if po-

lice initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* 475 U.S. at ——, 106 S.Ct. at 1411, 89 L.Ed.2d at 642.

It is undisputed that at the time detectives Hamblin and Greco spoke with defendant at the jail, defendant's sixth amendment rights had attached. *See United States v. Gouveia,* 467 U.S. 180, 187–88, 104 S.Ct. 2292, 2296–97, 81 L.Ed.2d 146, 154 (1984); *State v. Jackson,* 380 N.W.2d 420, 423–24 (Iowa 1986). The extent to which those rights restrict the State's relationship with the defendant was summarized by the Supreme Court in *Maine v. Moulton:*

> Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The sixth amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

474 U.S. 159, 170–71, 106 S.Ct. 477, 484–85, 88 L.Ed.2d 481, 492–93 (1985) (footnote omitted).

In order to overcome the presumed invalidity of an uncounseled, post-arraignment confession, the State must prove two things: (1) the defendant initiated the questioned communication and (2) the defendant knowingly and voluntarily waived his sixth amendment right to counsel after initiating that communication. *See Edwards v. Arizona,* 451 U.S. at 482, 101 S.Ct. at 1883–84, 68 L.Ed.2d at 385; *Jackson,* 475 U.S. at ——, 106 S.Ct. at 1409, 89 L.Ed.2d at 640–42; ("we must indulge every reasonable presumption against waiver; therefore it is the State that bears the burden of establishing a valid waiver.")

■ The dispositive question thus becomes whether defendant's inquiry about his keys constituted an "initiation" of interrogation. The parties agree that the answer turns on whether the inquiry is interpreted as a request for return of personal property, or the expression of a desire or willingness to talk generally about the keys and other facets of the investigation. In *Oregon v. Bradshaw,* the Supreme Court discussed generally the concept of "initiation", drawing a distinction between such inquiries:

> While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in Edwards.

462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405, 412 (1983). In *Oregon v. Bradshaw* the defendant querried "well, what is going to happen to me now?" leading a custodial officer to offer advice about pending charges and procedures and a recommendation that a polygraph test might be in order. The court, concluding that defendant's question "evinced a willingness and a desire for a generalized discussion about the investigation," *Id.* 462 U.S. at 1045, 103 S.Ct. at 2835, 77 L.Ed.2d at 412, upheld his conviction based on the incriminating statements subsequently made.

Measured by this standard, we are convinced that the record before us reveals no more than an inquiry posed by the defend-

ant concerning a routine incident of the custodial relationship—return of his personal property. We can find no support for the State's contention that defendant desired to open up a generalized discussion relating to the investigation. Apart from the State's failure to sustain its burden of proof on the issue, our decision is influenced largely by our recognition that the "sixth amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton,* 474 U.S. at 176, 106 S.Ct. at 487, 86 L.Ed.2d 496. The deterrent effect of the bright line *Edwards* rule seems to us appropriately applied where, as here, agents of the State abuse that guarantee.

Because we find the defendant did not initiate the police questioning which led to his confession, we need not address the validity of the *Miranda* waiver which the officers secured. *Michigan v. Jackson,* 475 U.S. at ——, 106 S.Ct. at 1411, 89 L.Ed.2d at 642. Accordingly, we reverse the trial court's denial of defendant's motion to suppress any statements given to the police while he was in custody, after his initial telephone inquiries, and remand the case for new trial in accordance with this opinion.

REVERSED AND REMANDED.