UNITED STATES of America,
Plaintiff-Appellee,

v.

Andrew ESCHWEILER,
Defendant-Appellant.

No. 83–2747.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1984.

Decided Sept. 21, 1984.

Rehearing and Rehearing En Banc
Denied Oct. 24, 1984.

Ted S. Helwig, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Edward Mogul, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Andrew Eschweiler was convicted by a jury of federal narcotics violations and was sentenced to five years in prison. His appeal raises a number of questions, most revolving around Harold Abrahamsen, who as government informer and prosecution witness played a key role in Eschweiler's apprehension and conviction.

Eschweiler sold cocaine and other illegal drugs from his apartment. He befriended Abrahamsen and let him live in the apartment rent free. Abrahamsen bought some drugs from Eschweiler for his own use and that of his friends, and also assisted Eschweiler in a minor way in his dealings. Abrahamsen needed money, and went to the FBI and offered to help apprehend Eschweiler if the FBI would pay him for his services. The FBI accepted the offer; and fitted out with a recording device, Abrahamsen thrice visited Eschweiler's apartment (Abrahamsen was no longer living there) and recorded conversations highly incriminating to Eschweiler. The prosecution played these conversations to the jury. Eschweiler's first argument on appeal is that the introduction of this evidence violated both the Fourth Amendment and the federal electronic-eavesdropping statute (Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.*).

■ Both the Fourth Amendment, by judicial interpretation, and Title III, expressly, allow an undercover agent to record his conversations with a suspect and allow the government to introduce the recording in evidence. See *Lopez v. United States,* 373 U.S. 427, 439, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963); 18 U.S.C. §§ 2511(2)(c), 2515. Eschweiler points out, however, that *Lopez* did not involve a conversation in the suspect's home; notes that the Supreme Court has held that the home is entitled to special protection under the Fourth Amendment, see, e.g., *United States v. Karo,* — U.S. ——, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984); *Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980); and conjures up a frightening specter of the government's sending undercover agents into the home to record every sound audible there, using "enhancement" devices to enable the recording of sounds in other rooms besides the one the agent is in.

■ But this is not the case in which to decide whether *Lopez* or Title III should be deemed inapplicable to surveillance within the home (a difficult position to sustain in the face of cases like *United States v. White,* 401 U.S. 745, 747, 91 S.Ct. 1122, 1123, 28 L.Ed.2d 453 (1971) (plurality opinion); *United States v. Janik,* 723 F.2d 537, 547 (7th Cir.1983), and *United States v. Yonn,* 702 F.2d 1341, 1346–47 (11th Cir. 1983)), or what difference amplification makes, or whether—though this is not something *we* are authorized to decide—the time has come to reconsider *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), which held that planting an undercover agent does not invade any interests protected by the Fourth Amendment. See generally Stone, *The Scope of the Fourth Amendment; Privacy and the Police Use of Spies, Secret Agents, and Informers,* 1976 Am.B. Foundation Research J. 1195. To begin with, this is not a case of an officer's worming his way into the confidence of a criminal suspect, gaining entry into the suspect's home, and then recording everything audible (and maybe some things not audible)

within it. The FBI did not send one of its employees into Eschweiler's apartment; it did not even "turn" Abrahamsen; the initiative was his. This is a classic case of misplaced trust in an associate's loyalty. Once Abrahamsen decided to help the government, wiring him for sound was a reasonable measure to obtain reliable evidence of Eschweiler's conversations with him—particularly since, as we shall see, Abrahamsen's personal reliability was not great. It is true that, maybe because the conversations did take place in a home rather than in a more conventional place of business, the recordings captured many conversations of a private nature, conversations ranging from the lurid (sex) to the banal (baking cookies). But a drug dealer cannot obtain immunity from customary methods of criminal investigation simply by conducting his business in his home rather than in a regular office. *Lewis v. United States, supra,* 385 U.S. at 211, 87 S.Ct. at 427. Eschweiler does not argue that the content of the recordings so prejudiced the jury against him as to deprive him of a fair trial.

■ He does argue that the microphone concealed on Abrahamsen was more sensitive than the human ear, suggesting a possible analogy to *Gouled v. United States,* 255 U.S. 298, 305–06, 41 S.Ct. 261, 263–64, 65 L.Ed. 647 (1921), where the Supreme Court held that a government agent who had gained admittance to Gouled's office by pretending he was paying him a social visit could not, while Gouled was out of the room, ransack the office and seize private papers of an incriminating nature. (This holding is unrelated to the holding in *Gouled* that was overruled by *Warden v. Hayden,* 387 U.S. 294, 300–10, 87 S.Ct. 1642, 1646–52, 18 L.Ed.2d 782 (1967)—that a search is improper if the object is merely to secure evidence. See 255 U.S. at 307–09, 41 S.Ct. at 264–65.) Dicta in *United States v. Llanes,* 398 F.2d 880, 884 (2d Cir.1968), and *United States v. Agapito,* 620 F.2d 324, 330 and n. 7 (2d Cir.1980), suggest that an undercover agent who uses amplifying equipment to overhear conversations in an-

**438**

other room that would have been inaudible to his naked ear invades interests protected by the Fourth Amendment; and there are similar holdings with regard to spying on the interior of a house or an office building through a telescope or binoculars. See *United States v. Taborda*, 635 F.2d 131, 138–39 (2d Cir.1980); *People v. Arno*, 90 Cal.App.3d 505, 511–12, 153 Cal.Rptr. 624, 627–28 (1979); *United States v. Kim*, 415 F.Supp. 1252, 1255–57 (D.Haw.1976). But there is contrary authority on telescopic and binocular observation, illustrated by *Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1970), including dicta in two Supreme Court decisions, *On Lee v. United States*, 343 U.S. 747, 754, 72 S.Ct. 967, 972, 96 L.Ed. 1270 (1952), and *United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927). And here there is the fact, which distinguishes *Llanes* and *Agapito*, that Eschweiler consented to Abrahamsen's presence. We know from *Lopez* that in order to be effective the consent did not have to extend to Abrahamsen's being wired. But there was also limited consent in *Gouled*. See also *Lewis v. United States, supra*, 385 U.S. at 211, 87 S.Ct. at 427.

Fortunately we do not have to resolve the issue of amplification in this case. The only conversations used in evidence against Eschweiler were his own conversations with Abrahamsen, which of course Abrahamsen could and did hear; the amplifying feature of the equipment he wore did not produce any evidence used against Eschweiler.

■■■ The next issue is whether the district judge should have ordered Abrahamsen to submit to a psychiatric examination as a condition of letting the government proceed with its case. Eschweiler argues that Abrahamsen was mentally incompetent to agree to become an undercover agent for the FBI and insufficiently trustworthy to be allowed to testify at the trial. We have expressed recently our reluctance to encumber criminal proceedings with psychiatric examinations of witnesses, *United States v. Gutman*, 725 F.2d 417, 420 (7th

Cir.1984), and nothing in this case causes us to change our position. It is true that Abrahamsen lied repeatedly to the FBI about whether he carried a gun (he did), and almost certainly lied when he told the grand jury that he had gone to the FBI to do his citizen's duty rather than to make money, and that he makes $36,000 a year— in fact he seems to have no regular work, and to live from hand to mouth. Besides often telling lies, Abrahamsen sometimes hallucinates—he has seen people coming up at him through the floor. These hallucinations apparently are drug-induced; and a doctor speculated that Abrahamsen may have been in a self-induced drug stupor when he decided to cooperate with the FBI. But neither the doctor's affidavit nor any other evidence about Abrahamsen's mental state required the district judge to order a psychiatric examination to determine the voluntariness of his agreement to become an undercover agent for the FBI. An informer's mental state is too collateral an issue in a criminal trial to require such an examination. As for Abrahamsen's competence to testify at trial (a different issue from the voluntariness of his consent to help the FBI), there is no serious argument that he was an incompetent witness as opposed to being an unreliable one; and his unreliability was an issue the jury was capable of evaluating without the help of a psychiatrist's report.

■■■ We also reject the argument that Abrahamsen should not have been allowed to testify because he was effectively immune from prosecution for perjury—that since he was the government's witness, the government would not prosecute him for perjury, provided he lied *for* the government. If accepted, this argument would make it impossible for anyone to testify for the government. An argument that leads to such a result cannot be right, and is in any event inconsistent with the principle that the government can agree not to prosecute a criminal in exchange for his testifying against his accomplices, see, e.g., *United States v. Librach*, 536 F.2d 1228, 1230 (8th Cir.1976), despite the obvious element

of inducement to testify as the government wants and the same practical near-immunity as in the present case from being prosecuted for perjury if the criminal lies in the government's interest. Of course there are limits to how far the government may go to induce a witness to cooperate. *United States v. Waterman*, 732 F.2d 1527 (8th Cir.1984), on which Eschweiler relies, holds that the government goes too far when it "offer[s] favorable treatment to a prosecution witness contingent upon the success of the prosecution." *Id.* at 1531. We need not decide whether we agree with this, for there was no offer of favorable treatment to Abrahamsen, let alone an offer contingent on his getting the goods on Eschweiler. Abrahamsen was not the proverbial target of an investigation who turns state's evidence to save his own hide.

■ The remaining issues relate to the FBI's search of Eschweiler's apartment, a search based on the recorded conversations and other leads supplied by Abrahamsen. Eschweiler argues first that the judge should have held a hearing to determine whether the FBI agent who prepared the affidavit on the basis of which the search warrant was issued had knowingly included false statements in the affidavit. See *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Some of the information supplied by Abrahamsen was false, but there is no indication that the agent knew this. And there was so much indubitable evidence that Eschweiler was selling illegal drugs from his apartment— the evidence of the recorded conversations—that even if the agent had knowingly included false information in the affidavit, this could have made no difference to the magistrate's decision. The magistrate would have issued the warrant on the basis of the true information even if the affidavit had not been embellished with any of Abrahamsen's false statements, and therefore the district court was not required to hold a hearing to determine whether the agent knew the affidavit contained such statements. See *id.* at 171–72, 98 S.Ct. at 2684–85.

■ During the search, an FBI agent went through an overcoat that was hanging in a closet and in one of the pockets found a small envelope for a safe-deposit box key. He opened the envelope (which was not sealed) and took out the key. On the basis (in part) of the key, the envelope, and a receipt, found elsewhere in the apartment, for the safe-deposit box, the government got a warrant to search the box, which contained cocaine and money. Eschweiler argues that the search of the envelope and the seizure of the key violated his rights under the Fourth Amendment and that the evidence seized from the safe-deposit box should have been suppressed as the fruit of the violation.

Since the warrant to search the apartment mentioned cocaine and money among the items to be seized in the search, the agent was entitled to go through the pockets of the overcoat; for either cocaine or money could easily have fit into a pocket. See 1 Ringel, Searches & Seizures, Arrests and Confessions § 6.5(a) at p. 6–27 (2d ed. 1984); cf. *United States v. White*, 706 F.2d 806, 808 (7th Cir.1983). It is not as if the agents had been searching for the Maltese falcon. Although the envelope that the agent drew out of the overcoat pocket did not contain cocaine or money, it was unmistakably an envelope for a safe-deposit box key; it *said* safe-deposit box key, and had the name of the bank on it. The agent was entitled to infer that Eschweiler had a safe-deposit box that might well contain cocaine, money from selling cocaine, or both. The inference was strengthened by the fact that the government had given Abrahamsen $1,250 in marked bills to buy cocaine from Eschweiler and he had spent it for that purpose, yet none of the money was in the apartment. All but $20 of it was found in the safe-deposit box.

■ The incriminating evidence (more precisely, the leads to incriminating evidence), consisting of the envelope and the receipt, was in plain view, and therefore could lawfully be seized without a warrant for it. See *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct.

2022, 2037, 29 L.Ed.2d 564 (1971) (plurality opinion); *United States v. McDonald*, 723 F.2d 1288, 1294–96 (7th Cir.1983); cf. *Marron v. United States*, 275 U.S. 192, 199, 48 S.Ct. 74, 77, 72 L.Ed. 231 (1927). Although it can be argued that the agent who opened the envelope and took out the key was conducting a further search and seizure not authorized by the search warrant and not permitted by the Fourth Amendment, the argument is a weak one. To begin with, since it is possible, though unlikely, that Eschweiler might have concealed illegal drugs in the envelope for the safe-deposit box key, the search warrant may have authorized a search inside the envelope; and once the envelope was opened, the key within was in the agent's plain view. Admittedly this point is debatable; it seems barely conceivable that anyone would conceal cocaine in an envelope for a safe-deposit box key, and maybe government agents, even when executing a valid warrant, ought not be allowed to rummage in places where the probability of finding anything described in the warrant is extremely slight. But this we need not decide, for a container that proclaims its contents on the outside is not a private place. This point would be obvious if the envelope had been transparent; then its contents would have been literally in plain view. The inscription and other characteristics that unequivocally revealed its contents made it transparent in the contemplation of the law. See *United States v. Jacobsen*, — U.S. —, 104 S.Ct. 1652, 1660–61, 80 L.Ed.2d 85 (1984); *Arkansas v. Sanders*, 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979) (dictum); *United States v. Bonfiglio*, 713 F.2d 932, 936–37 (2d Cir.1983); *United States v. Norman*, 701 F.2d 295, 296–98 (4th Cir.1983); *United States v. Buettner-Janusch*, 646 F.2d 759, 766–67 (2d Cir.1981).

 Even if, contrary to what we have just said, searching inside the envelope and seizing the key violated Eschweiler's Fourth Amendment rights, the violation was harmless. It gave the FBI nothing of significance that it did not already have. For if the envelope had been empty, this would not have negated or even weakened an inference that Eschweiler had a safe-deposit box that might contain contraband. The inference rested on the envelope, not on the key, and was reinforced by the finding of the receipt. Since the existence of the safe-deposit box thus "would inevitably have been discovered without reference to the police error" (if any) in opening the envelope and seizing the key, the evidence obtained in the search of the box was admissible even if the key should not have been seized. *Nix v. Williams*, — U.S. —, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984); see also *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920) (dictum) (Holmes, J.).

The only thing that gives us pause is *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (plurality opinion), a case with remarkable facts. Walter was a pornographer, and he sent by private carrier 12 packages containing a total of 871 boxes of pornographic homosexual films to a woman nicknamed "Leggs," who worked in Atlanta for one of his companies. Whether in ill-timed jest, or to make the shipment seem altogether on the up and up, he addressed the shipment to "Leggs, Inc." The carrier misdelivered the shipment to L'Eggs Products, Inc., the women's hosiery manufacturer, in a suburb of Atlanta. Employees of L'Eggs opened the packages and found the boxes, which disclosed their contents by graphic verbal descriptions and drawings delicately described in the Supreme Court's opinion as "suggestive." *Id.* at 652, 100 S.Ct. at 2399. The FBI was called, and it opened the boxes and ran the films on a projector to verify their obscene character. Walter and his associates, prosecuted for federal obscenity offenses, challenged the admissibility of the films. The Supreme Court held that the films were inadmissible; the FBI should have gotten a search warrant to open the boxes containing the reels. Es-

chweiler asks us to analogize the envelope containing the safe-deposit box key to the boxes containing the reels of film.

Because *Walter* is a plurality opinion, it is difficult to gauge its scope; but we are reasonably confident that it does not control the present case. Although the boxes of films were in plain view, the films themselves were not and it was merely likely, not certain, that they were obscene in the legal sense; but there was no ambiguity in the legend on the envelope in the present case. A related point is that the sensitivity of searches and seizures of materials that may be protected by the First Amendment, see, e.g., *Heller v. New York*, 413 U.S. 483, 488–89, 93 S.Ct. 2789, 2792–93, 37 L.Ed.2d 745 (1973); *Sequoia Books, Inc. v. McDonald*, 725 F.2d 1091, 1093 (7th Cir.1984), coupled with the ease with which a warrant could have been gotten in *Walter*, may have been what made the Court think a warrant required, though there could have been no doubt that it would have been issued if applied for. See *United States v. Bonfiglio, supra*, 713 F.2d at 938–39. Here no First Amendment interest lurks, however remotely, in the background. Moreover, the agents here had no real use or need for the key itself, whereas the films in *Walter* were vital evidence. The agents could not have walked into the bank with a key to Eschweiler's box and opened it, since they were not Eschweiler, or acting under his authority; and if they walked into the bank with a search warrant they would not need his key to open the box— the bank would open it for them. The key is a red herring. The important thing taken from the coat pocket was the envelope, and it was properly seized. Once seen it revealed its character, which led inexorably to the issuance of a warrant that we hold provided a valid basis for the search of the safe-deposit box. *United States v. Martin*, 562 F.2d 673 (D.C.Cir.1977), on which Eschweiler relies, is not a plain-view case. See *id.* at 676 n. 6.

AFFIRMED.