**UNITED STATES of America**

v.

**Robert Clark GRAY, Defendant.**

**Crim. No. 85–00059–B.**

United States District Court,
D. Maine.

April 28, 1986.

Jay P. McCloskey, Asst. U.S. Atty., Bangor, Me., for plaintiff.

Charles Hodsdon, Bangor, Me., for defendant.

## MEMORANDUM DECISION AND ORDER ON MOTIONS TO SUPPRESS

CYR, Chief Judge.

### FINDINGS OF FACT

At about 3:45 a.m. on November 6, 1985, agents of the Drug Enforcement Administration (DEA) and officers of the Maine State Police (MSP) executed search warrants at the rural residence of Beatrice M. Dostie. The warrant for the search of the house [1] itself authorized a search for "money and records" in connection with a "controlled buy" of two ounces of cocaine for $3,600 at the residence on November 2, 1985.

Ms. Dostie's arrest took place in the yard outside the same house immediately following a second controlled buy of cocaine (14 ounces) during the early morning hours of November 6, 1985. The search warrants were executed following the Dostie arrest.

The police descended upon the Dostie residence in marked cruisers with blue lights flashing. Upon learning that unidentified individuals had been seen inside a bedroom of the Dostie house by other officers who had been surveilling the premises

---

1. Another warrant authorized a search for cocaine in the Dostie garage, adjacent to the house, and in a motor home located in the yard.

in connection with the controlled drug buy, DEA Agent Wayne Steadman ordered that all persons inside the house show themselves at the windows and remain stationary. After waiting about four minutes, during which nobody appeared (except a male who appeared at a bedroom window), the officers broke in the door to the room at the end of the house adjacent to the garage.

Detective Sergeant Michael Harrington, a deputy sheriff assigned to the MSP antidrug task force, first entered the door and emerged into a carpeted room measuring approximately 12 x 20 feet ("entry room"), which was furnished with a stove, a couch, a small metal table and some metal chairs. A doorway led from this room to the kitchen and from the kitchen to the remainder of the house, including the bedroom in which Ms. Dostie's parents were found.

When he came into the entry room, Harrington saw defendant Gray and another man lying on the floor, between the couch, on one side of the room, and the stove, on the other. After both men had been handcuffed and while they remained on the floor, Steadman read them *Miranda* warnings. Each man acknowledged that he understood his rights.

Both men were taken to the adjacent garage, where their handcuffs were removed and they were told that they were not under arrest. Agent Steadman then separately advised Gray of his rights and received Gray's acknowledgment that he understood those rights. Although Gray did not expressly "waive" his rights, he answered Steadman's questions concerning his reason for being at the Dostie house. Gray also said that he had been to New York City with Dostie.

Meanwhile, Detective Harrington examined the pockets of two jackets he found in the entry room. Looking into the unfastened outside breast pocket of a nylon jacket draped over the back of one of the metal chairs in the entry room, Harrington found a laminated miniature facsimile of a high school diploma issued to "Robert Clark Gray," a rolled-up dollar bill and a trans-

parent baggie containing a white powder resembling cocaine. Prior to discovering the diploma card Harrington neither knew who owned the jacket nor had he taken any particular note of its size or style (men's or women's). The jacket itself bore no name or other external identification.

Following the discovery of cocaine in Gray's jacket pocket, he was brought back into the entry room and was asked by a MSP trooper whether the jacket belonged to him. Gray responded affirmatively. He was arrested and taken to jail, where a second search of his jacket disclosed an additional quantity of white powder, which field-tested as cocaine.

MERITS

A. *Motion to Suppress Fruits of Jacket Searches*

Defendant seeks suppression of the fruits of the searches of his jacket on the grounds that the search warrant was not supported by probable cause, that the first search of the jacket exceeded the scope of the search warrant and that the fruits of the second search were tainted by the unlawfulness of the first.

1. *Probable Cause*

The court is "not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the Magistrate's decision to issue the warrant." *United States v. Badessa,* 752 F.2d 771, 773 (1st Cir.1985), *quoting Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 2086, 80 L.Ed.2d 721 (1984). Suppression is not required unless the supporting affidavit was " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984), *quoting Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1973).

■ Agent Steadman's search warrant affidavit, which incorporates his affidavit

in support of the arrest warrant for Beatrice Dostie in connection with the November 2d cocaine buy, provides a substantial basis for the Magistrate's finding of probable cause to believe that some of the $3,600 in currency received by Dostie during the November 2d cocaine buy, as well as records relating to that or other drug transactions, would be found on the premises, including the house. The Steadman affidavit details the November 2d drug transaction, during which the informant was taken into the Dostie house, to the adjoining garage (where the cocaine was obtained), back into the house and then to the motor home in the yard. Relying on common sense and on Steadman's opinion (based on 17 years of experience as a DEA agent), it was entirely reasonable for the Magistrate to conclude that there was a likelihood that a search of the house would disclose records and the "controlled buy" currency from which the serial numbers had been recorded.

### 2. *The First Search of Defendant's Jacket*

Notwithstanding the fact that the defendant's jacket pocket certainly could have served as a repository for currency or records of the type sought in the warranted search of the premises, *see United States v. Eschweiler*, 745 F.2d 435, 439 (7th Cir.1984), *cert. denied.*, —— U.S. ——, 105 S.Ct. 1188, 84 L.Ed.2d 334 (1985), the question remains whether the jacket, which belonged to the defendant but was not being worn by him at the time of its discovery or search, was within the scope of the valid warrant for the search of the premises.

In *United States v. Micheli*, 487 F.2d 429 (1st Cir.1973), a divided First Circuit panel expressed disagreement as to the proper analysis for determining the lawfulness of a search of a briefcase discovered in the course of a warranted search of an office. "Without attempting to write in black letters ..," Chief Judge Coffin, writing for the majority, focused on "the relationship between the person [who owns the article] and the place" and on "why a person's belongings happen to be on the premises." *Id.* at 431–32. The majority upheld the search of the briefcase because (as the agents knew) it belonged to a co-owner of the business occupying the office and not to a "mere visitor or passerby who suddenly found his belongings vulnerable to a search of the premises. He had a special relation to the place, which meant that it could reasonably be expected that some of his personal belongings would be there." *Id.* at 432.

Judge (now Chief Judge) Campbell found himself "unable to accept the broad ruling suggested by the court—that the police, although armed with a warrant, may search an individual's personal effects found on the premises only if they know at the time of a close relationship between the person and the premises." *Id.* at 432–33 (Campbell, J. concurring).

One commentator has analyzed the problem this way:

> [T]he police cannot realistically be expected to avoid searching the property of a mere visitor to the premises unless they are aware of its ownership. Absent a requirement of such awareness, the effective execution of a warrant to search a place would be impossible since the police could never be sure that a plausible repository for items named in the warrant belongs to a resident, and hence is searchable, or to a nonresident, and hence is not searchable. Because of this, without notice of some sort of the ownership of a belonging, the police are entitled to assume that all objects within premises lawfully subject to search under a warrant are part of those premises for the purpose of executing the warrant.

2 W. LaFave, *Search and Seizure,* § 4.10(b) at 156, *quoting State v. Nabarro,* 55 Haw. 583, 525 P.2d 573 (1974).

The main message delivered by the *Micheli* majority is that the mere fact that a personal effect is not being worn or carried by its owner does not justify its search under the authority of a warrant for the premises if the owner of the article has no

more than a transitory connection with the premises. The *Micheli* majority did not need to reach the issue presented here, which is whether a warrant to search the premises authorizes the search of personal effects whose ownership or whose owner's connection with the premises is *not* known to the police. The majority opinion in *Micheli*, which focused on the relationship between the premises and the person whom the agents *knew* to be the owner of the briefcase, does not appear to preclude the search of an article belonging to a "mere visitor" unless the police are on notice "of some sort" that the article belongs to a "mere visitor."

Other cases which have applied the *Micheli* majority analysis have pointed to relevant circumstances of which the officers were actually aware. *See United States v. Branch*, 545 F.2d 177, 181–82 (D.C.Cir.1976) [defendant, who arrived about 45 minutes after police had begun to conduct warranted search of apartment, held to be "apparently a mere visitor" whose shoulder bag could not be searched pursuant to the warrant]; *United States v. Neet*, 504 F.Supp. 1220 (D.Colo.1981) [where police, surveilling a house in which an *earlier* drug transaction (by others) had been completed, saw a woman enter the house in the afternoon, "there was not the inference ... that she could be involved as a courier"; therefore, absent knowledge of woman's involvement in any narcotics transaction, police were not entitled to search her purse pursuant to a search warrant subsequently acquired for the house].

In *United States v. Hilton*, 469 F.Supp. 94 (D.Me.1979) (Gignoux, C.J.), this court, applying *Micheli*, concluded that a warrant to search for "telephone notebooks, tally sheets and other documents" at a coastal estate (apparently being used as headquarters for a marijuana offload) permitted officers, executing the warrant at 6:30 a.m., to search a briefcase and pocketbooks belonging to persons, found sleeping in the house, who claimed to have been vacationers from out-of-state. Chief Judge Gignoux reasoned that, because they "had each spent at least one night, if not more,

at the Estate and were clearly not mere passerbys .., 'it could reasonably be expected that some of [their] personal belongings would be there.'" *Id.* at 111, *quoting Micheli*, 487 F.2d at 432.

Prior to the first search of defendant's jacket, the officers did not know (nor did the circumstances prompt them to inquire) who owned the jackets found in the entry room. Defendant argues, not without some force, that the officers had good reason to believe that the two jackets were owned by the two men found in the room where the jackets were found. Nevertheless, the officers had detected movement inside the house prior to their forced entrance, thus making it quite plausible that other persons had been in the entry room immediately prior to the time the police forced open the door. Moreover, it was readily apparent to the officers that the room was an entry room, where any occupant or visitor (including Dostie or her parents) might have deposited their jackets. These circumstances tend to support Detective Harrington's testimony that he had no idea who owned the jackets, until after the search.

Even assuming that the officers knew or should have known from the outset who owned the red jacket in which the cocaine was found, the circumstances of which the officers could have been aware at the time of the search strongly suggested that the defendant was no "mere visitor or passerby." The defendant was found in the Dostie house at about 3:45 a.m., shortly after an informant had made a controlled "buy" of cocaine in the yard outside the residence. There is no evidence that the defendant had arrived *after* the drug buy, and that, therefore, he could not be inferentially connected to that transaction. *Compare United States v. Neet, supra.* Nor did defendant simply happen into the Dostie residence while the warrant was being executed. *Compare United States v. Branch, supra.* There is nothing to suggest that defendant had not been there at least "overnight." Indeed, Detective Harrington testified that he had been told to expect to find Dostie's

parents and one other person in the house. Agent Steadman testified that he had been told by other officers that there were persons moving about inside the house. Harrington saw a male person through a bedroom window. Finally, the movement of persons inside the house and their failure to show themselves at the windows when the police ordered them to do so suggested that the two men found in the entry room may have been attempting to avoid detection and, thus, may have been accomplices of Dostie, who had just been arrested.

■ Under these circumstances the officers reasonably could have viewed defendant as having a much more substantial connection to the Dostie residence than that of "a mere visitor or passerby who suddenly found his belongings vulnerable to a search of the premises," *Micheli,* 487 F.2d at 432.

■ The *Micheli* majority expressed the view that "[a] visitor in a private home stands in a different position from an habitue of a 'shooting gallery,' *United States v. Johnson,* 154 U.S.App.D.C. 393, 475 F.2d 977, 980 (1973) (Bazelon, C.J. dissenting in part)." *Micheli, supra* at 432. Though not exactly a "shooting gallery," the Dostie house was actually known to the police to be the residence of a person who had just been arrested following her second sale of illegal drugs in four days. Police engaged in the execution of a search warrant in the "dead of night" at residential premises where a controlled drug buy has just taken place cannot realistically be considered on *any* "sort of notice" that persons who have failed to show themselves on police command before the premises are forcibly entered are, if indeed they were, "mere visitors or passersby."

Speaking of the "rare situation which might give us pause, e.g., the search of the restaurant customer's raincoat under authority of a warrant to search the restaurant ...," Judge Campbell stated in *Micheli:* "[i]f the warrant was issued because the restaurant was suspected to be a betting parlor, a reasonable execution of the warrant might include a search of custom-

ers' raincoats (assuming the coats to be deposited on the premises, and not still on the backs of the customers)." *Micheli, supra* at 434.

It would be unrealistic in these circumstances to expect the officers to treat the deposited jacket as anything other than a plausible repository for the currency and records for which they held a valid warrant to search the premises. The Dostie house was actually known to the police to be the residence of a person who had just minutes earlier made a second sale of illegal drugs. The search of the red jacket was within the scope of the warrant for the premises.

### 3. *The Second Search of Defendant's Jacket*

■ Having discovered what appeared to be cocaine in a jacket pocket containing a rolled-up dollar bill and a laminated diploma bearing the name "Robert Clark Gray," the officers had probable cause to arrest the defendant. Once at the place of detention, they were entitled to search his person, *United States v. Deleo,* 422 F.2d 487, 491–93 (1st Cir.1970), which included the jacket previously searched in the entry room of the Dostie residence. Thus, the discovery of an additional quantity of cocaine in another pocket of the jacket was lawful.

### B. *Motion to Suppress Oral Statements*

Defendant moves to suppress oral statements which he claims were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The Government has agreed not to use defendant's admission that he owned the jacket in which the cocaine and related materials were found. Apparently, other statements were made by defendant, but it is not clear that they have any evidentiary value. Defendant has not indicated whether a ruling is required on the admissibility of any of these other statements. In view of the Government's stipulation, the court will defer decision on defendant's motion to suppress oral statements until defense

counsel has learned from Government counsel whether any other statements of the defendant are to be offered at trial.

## CONCLUSION

For the foregoing reasons, the motion to suppress the fruits of the searches of the pockets of defendant's jacket at the Dostie house and at the jail is DENIED.

Ruling on defendant's motion to suppress oral statements of the defendant is DEFERRED, pending a conference between counsel, to be held within 5 days of this order, and subsequent notification to the court by the defendant, within 10 days of this order, as to whether defendant presses his motion to suppress oral statements. Absent such timely notification, the motion shall be deemed withdrawn.

SO ORDERED.