In the Matter of JOHN DOE TRADER NUMBER ONE,

A Witness Before the Special January 1989 Grand Jury.

No. 89 GJ 25.

United States District Court, N.D. Illinois, E.D.

July 28, 1989.

**420**

law by persons associated with the Chicago Mercantile Exchange ("Exchange"). Respondent, John Doe Trader Number One ("Doe"), is a trader in the Swiss Franc pit of the Exchange. He was served with a subpoena *duces tecum* calling for the production of some of his personal trading records, including his trading cards, for the period of time involved in the investigation. Doe moved to quash the subpoena on the ground that the grand jury investigation is based in part upon evidence obtained by means of electronic surveillance conducted in violation of 18 U.S.C. § 2510 *et seq.* We held that a motion to quash is not the proper way to raise the issue of unlawful electronic surveillance and denied the motion. We then granted the government's motion to immunize Doe against the evidentiary use of his act of producing records [1] and ordered production. Doe appeared before the grand jury, but declined to produce the records, again basing his refusal on the ground that the information which prompted the subpoena was obtained by unlawful electronic surveillance. We issued a rule to show cause why Doe should not be held in contempt of court, and the matter has now been fully briefed.

James R. Ferguson and James P. Fleissner, Asst. U.S. Attys., Chicago, Ill., for the U.S.

Royal B. Martin, Jr., Leigh D. Roadman, Silets and Martin, Ltd., Chicago, Ill., for respondent.

## MEMORANDUM DECISION

GRADY, Chief Judge.

This matter is before the court on the motion of the United States for a contempt order against "John Doe Trader Number One" based upon his refusal to produce certain records subpoenaed by the grand jury.

## FACTUAL BACKGROUND

The grand jury is conducting an investigation into possible violations of federal

The government has filed affidavits of a special agent of the Federal Bureau of Investigation who was in daily contact with an undercover FBI agent posing as a commodities trader in the Swiss Franc pit of the Exchange. According to these affidavits, the undercover agent wore a trading jacket with microphones concealed in the upper torso area about eight inches from his ear. The undercover agent recorded numerous conversations he had with Doe as well as conversations Doe had with third persons when the agent was standing

... either directly adjacent to [Doe] or within approximately six feet of him. In every case, the agent was able to observe and listen to [Doe] engage in the subject conversation as it was simultaneously being recorded. There is not a single such conversation involving [Doe]

1. Doe has no Fifth Amendment privilege in regard to the contents of the records, but he does have the right not to be incriminated by his compelled act of producing them. *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984).

that the agent was not present during, a witness to, and able to simultaneously overhear.

The affidavits further aver that the microphones were never removed from the agent's trading jacket. The recording equipment utilized by the agent "was incapable of capturing sounds not otherwise audible to the agent. In particular, ... because the recording equipment was incapable of capturing certain frequencies, at both the high and low ranges of the human hearing spectrum, the equipment was actually less sensitive than the human ear." (Affidavits of May 8 and July 25, 1989).

## THE STATUTE

With some exceptions, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511, makes it unlawful to "intercept" certain communications, including "oral" communications. Section 2516 provides for court-authorized interceptions upon a showing of probable cause, but no court order was obtained in this case.

## THE CONTENTIONS OF THE PARTIES

Doe contends that his utterances recorded by the undercover agent were "oral communications" and that the recording of those utterances by the undercover agent was "interception." Because no court order authorized the interceptions, Doe concludes that they were unlawful.

The government argues that the recorded conversations were not "oral communications" within the meaning of the statute because Doe had no reasonable expectation of privacy with regard to those conversations. The government further argues that the conversations came within the "consent" exception of the statute and, finally, that the things seen and heard by the undercover agent provide an independent basis for the grand jury subpoena quite apart from the fact that some of the conversations were recorded.

## DISCUSSION

We will start with the question of whether there has been an "interception." We will then consider whether Doe's utterances were "oral communications."

### *"Interception"*

Section 2510(4) provides the following definition:

(4) "Intercept" means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.

Section 2510(5) defines "electronic, mechanical, or other device" as any device that can be used to "intercept a wire, oral, or electronic communication" (with certain exceptions). There is no dispute that a tape recorder qualifies as an electronic device since it can be used for the purpose of interception. The question presented is whether the recorder was used for that purpose in this case. Specifically, we must determine whether there was "aural ... acquisition of the contents of any ... oral communication through the use of [the] electronic ... device."

The statute does not define "acquisition," but the dictionary defines it as "the act or action of acquiring," and defines "acquire" as "to come into possession, control, or power of disposal of...." [2] In this case, it seems to us that the undercover agent aurally acquired the utterances of Doe by means of his naked ear. The recording device simply preserved what it was the agent was hearing independently of the device. This was the conclusion reached by the court in *United States v. Harpel*, 493 F.2d 346 (10th Cir.1974). In that case, a conversation was overheard by means of an extension telephone and simultaneously recorded by means of a tape recorder. The defendant was convicted of disclosing an unlawfully intercepted wire or oral communication in violation of § 2511(1)(c). One question on appeal was what constituted the interception:

The government has adopted the position of the trial court below that the intercepting device was the recorder and not

**2.** *Webster's Third New International Dictionary* (Unabridged).

an extension telephone. While such a view avoids the problem presented, we are simply not persuaded by this contention. We agree with appellant that the recording of a conversation is immaterial when the overhearing is itself legal. It is the means whereby the contents of the conversation are acquired that is crucial.... A recording device placed next to, or connected with, a telephone receiver cannot itself be the "acquiring" mechanism. It is the receiver which serves this function—the recorder is a mere accessory designed to preserve the contents of the communication. This interpretation comports squarely with the clear distinction drawn between "intercepting" and "recording" under 18 U.S.C. § 2518(8)(a), which deals with judicially authorized interceptions:

> The contents of any wire or oral communication *intercepted* by any means authorized by this chapter shall, if possible, be *recorded* on tape or wire or other comparable device. [emphasis added].

We therefore conclude that the tape recorder in question cannot constitute the intercepting mechanism when used, as it is argued here, connected to a telephone receiver.

493 F.2d at 350.

On similar facts, the same conclusion was reached in *Smith v. Wunker*, 356 F.Supp. 44, 46 (S.D.Ohio 1972) ("the means of 'oral acquisition' in this case is the telephone itself, and, of course, that is clearly exempted by 18 U.S.C. § 2510(5)(a)"). *See also* 1 LaFave and Israel, *Criminal Procedure*, § 4.3, p. 381: "However, in a case in which a person is lawfully overhearing a conversation, it is not an interception to record what is heard." (citing *United States v. Harpel*, 493 F.2d 346). *See also* the Annotation at 9 A.L.R.3d 423, § 5, pp. 434–447, collecting the many cases holding, under the language of a predecessor statute, that the recording of a telephone conversation by one of the participants was not a prohibited "interception."

Where a tape recorder is used to record a conversation which the government agent is unable to overhear with his naked ear, a different situation is presented. There, the tape recorder can be the means of "acquiring" the conversation, not simply the means of preserving it. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Fourth Amendment violation to place a recording device on the outside of a public telephone booth to surreptitiously record conversation).

The distinction is not simply linguistic or technical. The vitality of an important law enforcement technique is implicated. There is no indication that in the enactment of Title III Congress was seeking to prevent law enforcement officers from preserving an accurate record of conversations they could lawfully overhear. Indeed, as the court pointed out in *United States v. Harpel*, § 2518(8)(a) requires that, where possible, the contents of communications *intercepted* pursuant to court order shall, if possible, "be recorded on tape or wire or other comparable device." This not only indicates the Congressional consciousness of the distinction between intercepting and recording, as pointed out in *Harpel*, but also suggests the lack of any Congressional desire to prohibit the recording of a conversation that could be lawfully overheard.

We conclude that there was no "aural acquisition" of Doe's conversations through the use of the undercover agent's recording device. Therefore, there was no "interception" under § 2510(4).

*"Oral Communication"*

Section 2510(2) defines "oral communication" as:

> ... any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication.

The government argues that "expectation that such communication is not subject to interception" is identical to the "reasonable expectation of privacy" concept embodied in the line of cases beginning with *Katz v. United States*. Under this approach, Doe

would have to show that he reasonably expected that his utterances would not be *overheard*. It would not be enough for him to prove simply that he did not expect to be *recorded*. Doe sees it differently. The statute says "not subject to interception," and the "interception" here was the recording. This would mean that, unless Doe could reasonably have anticipated that he would be recorded, his utterances were "oral communications," whether or not he could reasonably have expected to be overhead.

As indicated in the preceding section of this opinion, we believe the recording of what is being lawfully overheard is not an "interception." However, to isolate the "oral communication" issue for separate analysis, we will assume that recording amounts to an interception and that Doe's utterances were "oral communications" unless he reasonably expected that they would not be recorded.

To show his reasonable expectation that he would not be recorded, Doe relies on the private character of the Exchange and the fact that it has a rule against tape recorders on the trading floor. He points out that the floor of the Exchange is open only to members. The Exchange rule he cites is a portion of Rule II, which provides:

II. Conduct.

Commonly accepted standards of propriety and decorum apply to everyone on the Trading Floor. Because the following behavior, speech or actions are inconsistent with those standards, they are expressly prohibited on the Trading Floor.

· · · · ·

H. Use of radios, television sets, tape recorders (including Walkman-type instruments), cellular telephones or computers, the latter without prior written authorization from the Floor Communications Committee; [3]

If the ban on tape recorders is addressed to confidentiality concerns, it seems to be the only portion of Rule II which has that purpose. The other paragraphs of Rule II that contain specific prohibitions pertain to such things as profanity, consuming food or drink, throwing trading cards, whistling, smoking and other conduct that might be distracting, discourteous, or obnoxious. If Doe was familiar with the rule (and he has submitted no evidence that he was), it is not self-evident that he would have regarded it as a guarantee of the confidentiality of his utterances.

We do not see how the semi-private nature of the Exchange, and the restriction of access to the Exchange floor, create any expectation that persons who do have access to the floor will not be carrying tape recorders. Aside from Rule II(H), there seems to be nothing about membership in the Exchange, or having access to the floor, that implies anything one way or the other as to possession of a tape recorder. A private home is certainly more private than the floor of the trading pit, but it offers no sanctuary from the tape recorder if the homeowner chooses to conduct his criminal activities there. *United States v. Eschweiler*, 745 F.2d 435, 437 (7th Cir. 1984). Doe's argument about the special character of the Exchange, then, boils down to the single fact that Rule II(H) prohibits recorders.

If a rule of this kind were sufficient to bar the use of tape recordings as evidence, it would follow that a criminal enterprise could protect itself from this highly probative kind of evidence by simply adopting a rule or posting a sign, "No recording permitted." This would be a sufficient basis for a reasonable expectation that there would be no recording. Doe argues that this is as it should be, because the government can always obtain a court order authorizing tape recording when probable cause can be shown. It is true that government agents will often have probable cause to believe that incriminating utterances will occur at a particular time and place, and in those situations a court order can be obtained. But compliance with the requirements of § 2518 takes time, including the time needed to obtain authorization from the Attorney General to seek the court order, and the opportunity for record-

---

**3.** Exhibit 2 to Trader's Supplemental Memorandum in Support of Motion to Quash Subpoenas.

ing could be lost. Moreover, there are many instances where probable cause is lacking, but where the ability to record conversations would nonetheless be a useful investigative device. From the government's standpoint, therefore, the ability to record without a court order is important.

It is time to look at the cases which have discussed the question of expectation in relationship to recording. As we shall see, the law is that one who has no reasonable basis for believing his conversations are not being overheard has, by the same token, no reasonable basis for believing they are not being recorded. In other words, overhearing and recording are about equally to be expected. Two Supreme Court cases are instructive.

In *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), decided before the enactment of Title III, the defendant was convicted of attempting to bribe an Internal Revenue agent. The bribe attempt took place in a tavern owned by the defendant. The agent had a tape recorder concealed in his pocket. As against the claim that the recording of the conversation was a violation of the Fourth Amendment, the Court stated:

> Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording.

373 U.S. at 439, 83 S.Ct. at 1388.

Lopez had not announced any rule or posted any sign in his tavern that tape recording was not allowed. It is difficult to imagine that the decision in the case would have been any different if he had. Lopez obviously *expected* that there would be no recording of the conversation, or he would not have engaged in it. The Court held, though, that his expectation was not reasonable.

In *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), another Fourth Amendment case, the Court again upheld the conviction of a defendant whose conversations with a government informant were recorded by electronic equipment the informant wore on his person. The Court reiterated the point made in *Lopez* that, if the "... conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent ... to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." 401 U.S. at 751, 91 S.Ct. at 1126. The Court went on to note that the rule does not depend upon what the defendant *in fact* expected:

> Our problem is not what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions. Very probably, individual defendants neither know nor suspect that their colleagues have gone or will go to the police or are carrying recorders or transmitters. Otherwise, conversation would cease and our problem with these encounters would be nonexistent or far different from those now before us. Our problem, in terms of the principles announced in *Katz*, is what expectations of privacy are constitutionally "justifiable" —what expectations the Fourth Amendment will protect in the absence of a warrant. So far, the law permits the frustration of actual expectations of privacy by permitting authorities to use the testimony of those associates who for one reason or another have determined to turn to the police, as well as by authorizing the use of informants in the manner exemplified by *Hoffa* [*v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ] and *Lewis* [*v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17

L.Ed.2d 312 (1966) ]. If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case. See *Lopez v. United States,* 373 U.S. 427 [83 S.Ct. 1381, 10 L.Ed.2d 462] (1963).

401 U.S. at 751–52, 91 S.Ct. at 1125–26.

The Court made a comment directly relevant to Doe's point that, while he may not have expected complete *privacy,* he still expected there would be no *recording:*

> Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recognition, particularly under the Fourth Amendment which is ruled by fluid concepts of "reasonableness."

401 U.S. 752–53, 91 S.Ct. at 1126.

The following observations are pertinent to Doe's position that, in the facts of the instant case, a court order should have been obtained:

> Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do not favor the defendant, but we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question.

401 U.S. at 753, 91 S.Ct. at 1126–27.

Concluding that it was "untenable" to make a constitutional distinction between an agent acting with a recorder and the same agent acting without a recorder, the Court noted that "[o]ur opinion is currently shared by Congress and the Executive Branch, Title III, Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 212, 18 U.S.C. § 2510 *et seq.* (1964 Ed., Supp. V), and the American Bar Association." The statute referred to by the Court in this passage is the very statute involved in the instant case. It is not clear what language of the statute the Court regarded as reflecting that Congress shared its opinion about the lack of distinction between the agent with and without a recorder, but the conclusion of the Court is clearly an interpretation of the statute that cannot be ignored. This remark of the Court tends to bear out the government's contention that an "oral communication" under the Act requires an expectation of *privacy* rather than merely an expectation that there will be no recording.

The courts of appeals have followed the lead of the Supreme Court, holding that, where there is no reasonable expectation of privacy, neither can there be a reasonable expectation that a conversation will not be recorded. *United States v. Eschweiler,* 745 F.2d at 437; *United States v. Santillo,* 507 F.2d 629, 634 (3rd Cir.1975) ("the me-

chanical ear of the recorder is no different than the ear of a listener with a precise memory"). *United States v. Harpel*, 493 F.2d at 350. *See also United States v. Carroll*, 337 F.Supp. 1260 (D.D.C.1971); *Wilks v. Commonwealth*, 217 Va. 885, 234 S.E.2d 250, 253 (1977) (interpreting Virginia statute substantially identical to Title III). The rule applies both to conversations to which the agent is a party and those which take place in his presence. *United States v. Coven*, 662 F.2d 162, 173 (2d Cir.1981), *cert. denied*, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982); *Grandbouche v. Adams*, 529 F.Supp. 545, 548 (D.Col.1982).

In light of these cases, the Exchange rule against tape recording is clearly too slender a reed to support Doe's claim that he reasonably expected there would be no recording. The rule does not have the force of law, and it was altogether predictable that government agents, if they were even aware of it, ignored it when they suspected the presence of criminal activity. Doe could not reasonably believe an undercover law enforcement officer posing as a trader would feel constrained by the rule. And, as the cases make clear, neither could he have had a reasonable expectation that other apparent traders were not undercover agents. In short, if Doe really did believe the Exchange rule protected him from the recording of his conversations, his belief was naive rather than reasonable.

We conclude that, even on Doe's theory that he was "intercepted" by means of the tape recorder, the interception was lawful unless he had a reasonable expectation that his utterances would not be *overheard*. The affidavits filed by the government establish that the undercover agent was a party to some of the recorded conversations with Doe, and that all recorded conversations took place within six feet of the agent. There is no evidence that Doe took any pains to keep his utterances from being overheard by the agent.

A final consideration is whether there was anything unlawful about the agent placing himself in a position to overhear Doe's utterances. Doe does not argue that the overhearing—as opposed to the record-

ing—was unlawful, and with good reason. One who talks in a tone that can be overheard assumes the risk that he will be overheard by a law enforcement officer. *United States v. McLeod*, 493 F.2d 1186, 1188 (7th Cir.1974); *United States v. Llanes*, 398 F.2d 880, 884 (2d Cir.1968); *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir.1978); *State v. Benton*, 206 Conn. 90, 536 A.2d 572 (1988).

Our conclusion is that Doe did not have a reasonable expectation that his utterances would not be overheard and recorded. Therefore, his utterances were not "oral communications" within the meaning of § 2510(2).

### Doe's "Enhancement" Argument

 Doe argues that the tape recording of his utterances may have captured more than the undercover agent was able to hear on the floor of the pit, especially in view of the frenetic trading activity and the "din" that prevailed there. While this is a possibility, the simple answer to it is that the affidavits filed by the government aver that the tape recording contains nothing that the agent did not hear. It is true that the cases which have approved the use of recording equipment have usually emphasized that the recorder captures nothing more than the ear is able to hear. If the recorder did in fact do more than that, we would be back to the issue of whether there is, after all, an "interception" of at least those utterances that the agent was unable to hear. The expectation of non-interception would also be implicated, since, if Doe could reasonably believe that his utterances were not being overheard, it would follow that it was reasonable for him to expect that they were not being recorded.

Doe urges that he should be allowed to go behind the government affidavits and request an evidentiary hearing into all of the circumstances surrounding the activities of the undercover agent. He also requests that the government file an additional affidavit stating, as to each recorded communication, "(1) who was a *party* to [the] oral communication; (2) what the sub-

stance of the oral communication was; (3) when the communication occurred; and (4) at what location the oral communication took place in relation to the undercover agent and the electronic intercepting and recording equipment." (Trader Number One's Motion for an Evidentiary Hearing and Additional Detail, p. 3). Doe also requests that the tapes themselves be produced in order to assist the court in determining whether the utterances recorded appear to have been made with the expectation that they would not be recorded.

The procedure to be followed by the court when the question of unlawful electronic surveillance is raised by an aggrieved person is provided in Title 18 § 3504(a)(1):

(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act....

The government has done far more in this case than simply to "affirm or deny," in conclusory terms, that it engaged in illegal electronic surveillance. We take judicial notice of the fact that, when a grand jury witness in this district raises a question as to whether he has been subjected to electronic surveillance, and there has been no such surveillance, the government attorney will simply make a representation to that effect, or, at most, file an affidavit by the investigating agent to that effect, and that usually ends the matter. No witness, to our recollection, has asked for an evidentiary hearing into the truth of the denial. While the usual practice is not binding on Doe if the law entitles him to more, it is nonetheless of interest that the bench and bar of this district have interpreted § 3504(a)(1) literally, to require no more than a simple denial when the government asserts there has been no electronic surveillance. More importantly, the practice conforms with the law of this Circuit. *See Korman v. United States*, 486 F.2d 926, 930–31 (7th Cir.1973) (holding that an affidavit by an attorney for the government,

or by an appropriate law enforcement officer, denying the electronic surveillance is sufficient, and that no evidentiary hearing is required).

In this case, of course, electronic surveillance did occur. What the government denies is that the surveillance is unlawful. We believe that what § 3504(a)(1) requires in that situation is an affidavit with enough particulars to enable the court to determine that, assuming the truth of the affidavit, the surveillance was not unlawful. If it is proper to assume the truth of a sworn denial that there was any surveillance at all, it would appear equally proper to assume the truth of a sworn description of surveillance that did occur. This seems entirely consistent with *Korman*. A contrary holding would involve the court in an extended evidentiary hearing, exploring the circumstances of each and every recorded communication, and that seems clearly unintended by the statute. While we agree with Doe that we have discretion to conduct whatever hearing we might think necessary, there is nothing about the government's response in this case that indicates a real need for further inquiry. The idea that a tape recorder concealed on the agent's person was able to record what he heard, and no more, is certainly not contrary to experience; in fact, this court's impression of tape recordings received in evidence in many trials over the years is that they are almost invariably inferior to what the participants in the conversation must have been able to hear with their naked ears. This is why a tape recording is always accompanied by a typewritten transcript which the jury reads while listening to the tape. Without such a transcript, large portions of the tape are typically not understandable.

Another aspect of Doe's request for a hearing is that it would undoubtedly be only one of many such requests in this investigation. The parties have informed the court that the utterances of many other prospective grand jury witnesses were overheard and recorded on the floor of the Exchange.

The motion of Doe for a further affidavit, production of the tapes, and an evidentiary hearing is denied.

### The Consent Exception

■ Title III permits the interception of communications without a court order in specified situations, one of which is the "consent exception" found in § 2511(2)(c):

(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

The government argues that the conversations held directly between the undercover agent and Doe are expressly excepted by the "color of law" clause, and we agree. Thus, even if Doe's utterances were "oral communications" and the recording was "interception," it was still lawful for the undercover agent to record his own conversations with Doe. The government contends that the next clause of § 2511(2)(c) excepts those conversations to which the agent was not a party but which he overheard. The theory is that, by speaking in the presence of the agent, Doe "consented" to being overheard and thus to being recorded. The government cites *Grandbouche*, 529 F.Supp. at 548, and the case does support the argument. The court treated § 2511(2)(c) as an *implied* consent provision, holding that, even if the plaintiffs in that case "... did not expect Adams to listen to those conversations, and thus did not relinquish their expectation of privacy, the simple fact remains Adams could hear those conversations, and could listen attentively without indicating to the plaintiffs that she was doing so." *Id.* We are not so sure that the consent clause of § 2511(2)(c) is simply a codification of the "reasonable expectation of privacy" test of *United States v. White*, as the *Grandbouche* court thought. If it is more than that, and a conscious consent is required, the record before us is inadequate to establish that Doe consciously consented to the agent's listening to his conversations with third persons. Resolution of the matter would probably require an evidentiary hearing. A hearing might also be necessary in order to segregate the tapes that recorded Doe's conversations with the agent and his conversations with third persons. It could be that only the former would be a proper basis for the grand jury subpoena, and it might be necessary to determine what evidence was derived from which kind of recorded conversation. We decline to enter this thicket, because it is not necessary to do so. Our decision will not be grounded on the § 2511(2)(c) consent exception.

### The Independent Source Argument

The government contends that, regardless of the legality of any tape recording, there is other adequate basis for the grand jury subpoena. Specifically, one of the government affidavits recites that the undercover agent "personally observed [Doe], on several occasions, engage in non-'open-outcry' trades not executed in the market. In addition, the agent observed and engaged [Doe] in 'curb' trading after the closing bell." The government offers no argument as to how these observations relate to the subject matter of the grand jury investigation, and we are unable to determine from this brief statement that there is in fact an independent basis for the inquiry directed against Doe. Again, this appears to be a matter as to which an evidentiary hearing would be required. (The limited kind of submission that suffices under § 3504(a) would not necessarily be adequate to resolve the "independent source" question). Accordingly, we will not reach the question of whether there is an independent basis for the subpoena.

### CONCLUSION

Doe has failed to show cause why he should not be held in contempt of court for his refusal to produce the subpoenaed records pursuant to this court's order. He has not shown that his utterances were "oral communications" within the meaning of 18 U.S.C. § 2510(2) or that there was any "interception" of his communications through the use of an electronic device

within the meaning of § 2510(4). Doe is directed to produce the records to the grand jury at its next session, failing which an order of contempt shall issue.